COUNTY SAVINGS BANK, Appellee, v. WILLIAM M. JACOBSON et al., Appellants.

**CONTRACTS: Lex Loci Contractus—Negotiation of Commercial Paper.**
1  A tentative understanding between an Iowa and a Minnesota bank to the effect that the foreign bank would negotiate commercial paper to the Iowa bank and guarantee the payment thereof, becomes a consummated Iowa contract upon the *receipt and acceptance* in this state of the paper aforesaid.

**BILLS AND NOTES:   Presentment, Demand, Notice, and Protest—**
2  **Waiver.**  Presentment to and demand on the maker and notice to the indorser of dishonor are waived by the subsequent unconditional promise of the indorser to pay the obligation.

**FRAUDULENT CONVEYANCES:   Evidence—Sufficiency.**   Evidence
3  held sufficient to sustain a decree which held the conveyance fraudulent.

Headnote 1:  8 C. J. p. 89; 12 C. J. p. 449; 13 C. J. p. 581; 28 C. J. p. 937.  Headnote 2:  8 C. J. p. 709.  Headnote 3:  27 C. J. p. 821.

Headnote 1:  5 R. C. L. 931.  Headnote 2:  33 L. R. A. (N. S.) 640; L. R. A. 1916B 944; 3 R. C. L. 1187.  Headnote 3:  12 R. C. L. 669.

*Appeal from Kossuth District Court.*—JAMES DELAND, Judge.

JANUARY 18, 1927.

An action to recover on certain promissory notes, to hold the Minnesota Transfer State Bank on an alleged guaranty, and to set aside a transfer made by Jacobson of certain property alleged to have been conveyed in fraud of creditors.  The district court granted the relief prayed, and Jacobson and the Minnesota Transfer State Bank both appeal.—*Affirmed.*

*Price, Burnquist & McCall* and *Christofferson, Walsh, Christofferson & Jackson,* for appellants.

*Sullivan, McMahon & Linnan* and *W. H. Morling,* for appellee.

ALBERT, J.—We will first dispose of the appeal of the Minnesota Transfer State Bank.

The appellee is a banking corporation under the laws of the state of Iowa, doing a general banking business at Algona, Iowa. The Minnesota Transfer State Bank is a banking corporation organized under the laws of the state of Minnesota, with its place of business at St. Paul in said state. E. J. Murtagh was president of the Iowa bank, and A. T. Wherry was president of the Minnesota bank. These two presidents met in Washington, D. C., in the year 1920, and Wherry stated to Murtagh that the Minnesota bank would like to negotiate some paper with the Iowa bank, and assured Murtagh that the Minnesota bank would stand behind all paper so sent to the Iowa bank, and would see that it was paid, and that it would absolutely guarantee the paper. Later, the Minnesota Transfer State Bank sent to the Algona bank certain promissory notes made by the Fosston Manufacturing Company, a concern manufacturing washing machines in the state of Minnesota, together with the promissory notes of some other parties. These promissory notes were accepted by the Algona bank, and the proceeds passed to the credit of the Minnesota bank, which proceeds were subsequently withdrawn by the Minnesota bank. Some of the notes so received were taken up by the substitution of others, and some were renewed. The general procedure was that, when any of the notes so held by the Algona bank became due, they were charged to the account of the Minnesota bank, which latter bank ran an account in the Algona bank, and were forwarded to the Minnesota bank, with advice that the same had been thus charged. This was the general course of procedure between these two banks for something like two years. At the termination of the transaction, the Algona bank held two notes given by the said Fosston Manufacturing Company, amounting to $15,000, which are the basis of this suit. The evidence shows quite conclusively

1. CONTRACTS: *lex loci contractus*: negotiation of commercial paper.

that the various notes received by the Algona bank were received under a guaranty from the Minnesota bank that said notes would be paid. These two notes were not paid; hence the suit, so far as the Minnesota bank is concerned.

The first question urged is that the contract is a Minnesota contract, and the law of Minnesota is pleaded, governing such banking institutions, which prohibits the making of such guaranty as is insisted upon in this case. The first question, therefore, is whether this is a Minnesota contract or an Iowa contract. It is a general rule, too well settled to need citation of authorities, that the law of the place where the contract is made, in the absence of any stipulation to the contrary, governs the contract, which must be construed according to the law of the place of its execution. In fact, such law becomes a part of the contract. The real difficulty lies, ordinarily, in determining what is the place of the contract. This much may be taken as settled, however, that a contract is, for the most purposes, deemed to have been made at the place or within the state where the final act necessary to make it a binding obligation is done. *Gipps Brewing Co. v. De France*, 91 Iowa 108.

This does not settle the matter, however; for it remains to be determined what one act is necessary to complete the contract, and where such act was done. In contracts of this kind, it seems quite well settled that it is the place where the acceptance is made. In other words, the *lex loci contractus* is the law of the place of acceptance. Where a resident of one state places a letter in the mail, making an offer to one who resides in another state, the contract is completed in the place where the acceptance is mailed. *Equitable Life Assur. Soc. v. Perkins*, 41 Ind. App. 183 (80 N. E. 682); *Emerson Co. v. Proctor*, 97 Me. 360 (54 Atl. 849); *Saint Nicholas Bank v. State Nat. Bank*, 128 N. Y. 26 (27 N. E. 849).

It is apparent from the record in this case that the conversation that took place between the presidents of these respective banks in Washington was nothing more than a proposition or offer on the part of the Minnesota bank, in pursuance of which it later forwarded this commercial paper to the Algona bank. The Algona bank having accepted the paper and paid the Minnesota bank therefor, as above explained, it must be held that this is an Iowa contract, and not a Minnesota contract. We are

compelled to hold, therefore, that appellant bank's contention on this proposition,—to wit, that the contract was a Minnesota contract, and therefore governed by the law of Minnesota,—is erroneous.

Further than this, the claim that the Minnesota statute prohibits such guaranty, and therefore should be controlling on this court, is fully disposed of in the case of *Central Metro. Bank v. Chippewa County St. Bank*, 160 Minn. 129 (199 N. W. 901), where it is held, under a similar set of facts to those in the case at bar, that the question of guaranty was not involved, and that the Minnesota bank was estopped from claiming that the president of the bank had no authority to make such guaranty. The letters accompanying the various commercial paper that was sent by the Minnesota bank to the Algona bank, if not in words, in substance, recognize and confirm the guaranty of the Minnesota bank to the Algona bank; and the notes in controversy were made by the Fosston Manufacturing Company, payable to itself, and were turned over to the Minnesota bank, which forwarded them to the Algona bank; and, while President Wherry, of the Minnesota bank, was also an officer in the Fosston Manufacturing Company, the evidence very satisfactorily shows that the other officers of the Minnesota bank knew and understood the exact conditions under which the commercial paper was being sent by their bank to the Algona bank. Since the Minnesota bank, therefore, received the full benefit of this contract between the two banks, and the officers of the Minnesota bank knew the conditions under which it received the proceeds, they are not now in a position to question the guaranty, regardless of whether or not they entered these notes in the bank books at St. Paul. Appellants are wholly in error when they insist that, under the record, this was wholly a transaction between the Fosston Manufacturing Company and the Algona bank. So far as the Algona bank is concerned, the Minnesota bank received all the proceeds from the paper thus taken from the Algona bank; and what it may have done with the proceeds thereafter is a matter of no concern to the Algona bank. This, in substance, is likewise the holding in the *Central Metropolitan Bank* case above cited. We have no doubt, from the evidence, that the Algona bank was warranted in accepting said commercial paper under an agreement and understanding that the same was guaranteed by the

Minnesota bank. No good can come to either of the parties or to the profession by setting out this voluminous record and the many transactions between these two banks during this period of time. We have carefully reviewed the same, and find that the district court made no error in its ruling in granting the relief prayed as against the Minnesota Transfer State Bank.

As to the appeal of W. M. Jacobson, it appears that the notes sued on herein bore the indorsement of W. M. Jacobson at the time they were delivered to appellee. The $10,000 note was due 150 days after November 28, 1923, and the $5,000 note 90 days after January 18, 1924. The weight of the evidence shows that, after both of these notes were due, they were presented to Jacobson by the holder and his attorney, and Jacobson unqualifiedly promised on different occasions that he would pay the same. It is insisted by Jacobson that, because no demand was made on the maker, and no notice of dishonor was given to him, he was thereby released from liability on these notes. Section 109 of the Uniform Negotiable Instrument Act, Section 9570, Code of 1924, provides as follows:

2. BILLS AND NOTES: presentment, demand, notice, and protest: waiver.

"Notice of dishonor may be waived, either before the time of giving notice has arrived, or after the omission to give due notice, and the waiver may be express or implied."

Brannan's Negotiable Instruments Law (4th Ed.) 701. states the rule to be:

"An indorser who, after the time for giving notice of dishonor, declares his intention to pay the note, waives notice of dishonor, whether he had knowledge of his discharge by failure to give notice or not, and no consideration is necessary to support a waiver."

See *Doherty v. First Nat. Bank,* 170 Ky. 810 (186 S. W. 937); *Engle v. Shepherd,* 100 Okla. 200 (229 Pac. 208); *Burgettstown Nat. Bank v. Nill,* 213 Pa. St. 456 (63 Atl. 186); *Thompson v. Curry,* 79 W. Va. 771 (91 S. E. 801).

This is not new law in Iowa, however, as, prior to the adoption of the Negotiable Instrument Law, we held, in *Hughes v. Bowen,* 15 Iowa 446, in substance, that a promise by the indorser of a promissory note, after maturity, to pay the same, with knowledge of the fact that it has not been presented for payment and protested, operates as a waiver of such presentation and

protest. And further, that,' in showing such knowledge, it is not necessary to show that the indorser knew the legal effect of the laches of the holder. It is sufficient if he knew the facts; he is presumed to know the law. This doctrine was reaffirmed in *Creshire v. Taylor*, 29 Iowa 492, in which case we said:

"The fact appellant was ignorant of his legal rights and exemptions in the premises will not destroy the effect of his promises and agreements, which we have held sufficient to establish a waiver. He can demand no protection on account of ignorance of the law; if he knew the facts, he is presumed to know the law."

And we further held in that case that "a consideration is not required, to support a waiver of demand and notice," citing *Hughes v. Bowen*, supra. These cases are followed in *Allen v. Harrah*, 30 Iowa 363; *Lomax v. Smyth & Co.*, 50 Iowa 223; *Davis v. Miller*, 88 Iowa 114.

It must be held, therefore, under this record, that the evidence shows that Jacobson waived the failure of the plaintiff to make demand and give him notice of nonpayment.

The appellee's case, so far as Jacobson is concerned, is (1) to recover a judgment against Jacobson on his indorsement on these promissory notes, and (2) to set aside a conveyance made by him of certain real estate to his brothers, and to subject the property to the judgment thus obtained. It appears without dispute that A. Jacobson died in 1920, possessed of 680 acres of land in Kossuth County, some bank stock in the Ringsted bank, and possibly some other property. His wife predeceased him, and this property passed by descent to William M. Jacobson, appellant herein, Charles O. Jacobson, and Alfred B. Jacobson, sons of the said A. Jacobson. In connection with this matter, it seems that the elder Jacobson created a trust of $20,000 in favor of the son, Alfred B. Jacobson. On or about May 1, 1924, William M. Jacobson quitclaimed his interest in said land to his brothers, Charles O. and Alfred B. Jacobson, and it is this conveyance that is sought to be set aside, on the ground that such conveyance was made with intent to injure, delay, and defraud the creditors of said William M. Jacobson. Referring to cases of this character, we said, in *Mulvaney v. Buckley*, 190 Iowa 1119, that each case must stand on its own peculiar facts. We cannot detail all

3. FRAUDULENT CONVEYANCES: evidence: sufficiency.

the evidence on this issue in this case, but will briefly summarize the same.

Execution of the quitclaim deed is admitted, and William M. Jacobson claims that it was made for a full and valuable consideration, without any intention whatever to defraud appellant or any of his other creditors. After the death of the father, the business, with relation to the property thus derived from the father, was carried on in the name of the "Jacobson Estate," there having been no partition of the land, which continued to be in the name of A. Jacobson on the records, until this quitclaim deed was made, and all matters in relation thereto were conducted in the name of the "Jacobson Estate." William Jacobson was at one time an officer of the Minnesota bank, and was also interested in the Fosston Manufacturing Company. His brother, Charles O., was engaged in the oil business, and they had an office together in Minneapolis. Aside from the shares of stock owned by the Jacobson estate, William owned some shares of stock in that bank individually. The bank at different times was in financial distress, and assessments were made on the stock. Finally, in the latter part of 1923 or early part of 1924, William became involved financially, and claims that he was borrowing money at various times from his brothers or from the estate fund. He testifies that, at various times from 1921 to 1923, he guaranteed some $200,000 worth of paper for the aid of the Ringsted bank, which guaranty was still outstanding at the time of the controversy herein, and at the time the conveyance was made. His own statement is that, when assessments were made on stock of the Ringsted bank, or when he was called upon to pay any other considerable sum of money, he was compelled to borrow from his brothers. It is evident that the pressure of debts was heavy upon him at this time, and the evidence also shows that he had numerous outstanding obligations unsatisfied. When urged to explain why he made this conveyance, he did not at that time claim that it was for a valid consideration, but claimed that it was "so he could handle his land and not be troubled by any cheap St. Paul lawyer." It appears that, early in 1924, a mortgage of $30,000, executed by the three brothers, was placed on this land. $14,000 of the proceeds of this mortgage seems to be wholly unaccounted for in this record. After the transfer, William continued to rent the land

and to draw checks on the Ringsted bank; and, aside from the quitclaim deed, all matters in relation to this land and the bank account with the Ringsted bank were carried on in the identical manner that they had been before the conveyance was made. The close relation of these brothers, especially in a financial way, as shown by the record, is such that we feel justified in concluding that William's financial distress was fully known and understood by the brothers. His evidence by which he seeks to show that a fair consideration existed for this quitclaim deed is not satisfactory to us. The law governing these cases is well settled. As stated by appellant, the burden is on the plaintiff to prove that William Jacobson acted fraudulently, and that Charles Jacobson participated in the fraud. *Crenshaw v. Halvorson,* 183 Iowa 148, and cases therein cited; *LeSell v. Mendenhall,* 186 Iowa 980. It is true that mere suspicion of fraud is not sufficient, as stated in *Ford v. Ott,* 182 Iowa 671, and cases. Neither does the fact that the parties were brothers carry a presumption of fraud. *State Bank of Woolstock v. Schutt,* 174 Iowa 583.

We have not attempted to incorporate herein all of the evidence in this record, nor all of the material parts thereof, as nothing would be gained by so doing.

After having carefully read and weighed all the evidence on this issue, we are satisfied that the ruling of the district court was correct.—*Affirmed.*

EVANS, C. J., and STEVENS and DE GRAFF, JJ., concur.

MORLING, J., not participating.