E. L. HUGHES, doing business under the trade name of HUGHES
CONSTRUCTION COMPANY, Appellee, v. NATIONAL
EQUIPMENT CORPORATION, Appellant.

No. 41893.

September 26, 1933.

Maxwell & Ryan, James B. Ryan, and Ronald L. Ryan, for appellant.

Vernon W. Lynch, for appellee.

Donegan, J.—The plaintiff-appellee, E. L. Hughes, is a contractor doing business under the trade-name of Hughes Construction Company. During the spring of 1930, plaintiff had a subcontract for the grading of a portion of a line of railroad of the Rock Island Railway Company near Jamesport, Missouri. While such grading job was being done, one K. R. Osman, with whom plaintiff had been acquainted for several years, visited the job and endeavored to interest the plaintiff as well as other contractors in certain machines known as dumptors, then being sold by defendant, National Equipment Corporation. On or about the 28th day of April, 1930, plaintiff and said Osman had a talk, as a result of which plaintiff entered into a written contract with the defendant, National Equipment Corporation, covering the purchase of two dumptors. This written contract was forwarded to defendant's place of business

at Milwaukee, Wisconsin, and was there signed by the defendant corporation on the 30th day of April, 1930. The contract was made upon a form of contract used by the defendant corporation, and the blanks upon this contract were filled in by said Osman. At the time that Osman prepared said contract he also prepared a carbon copy thereof upon a blank of the defendant corporation. The blank form upon which the copy was made out was identical with the blank used in making the original, with the exception that it was of a different color. Such carbon copy was signed by Osman upon a blank line near the bottom thereof, under which the words "Salesman sign as witness" appear, and was left with the plaintiff, but the name of said Osman does not appear upon the original of the contract which was forwarded to Milwaukee. During the course of the negotiations between plaintiff and said Osman, and before the contract was signed by plaintiff, the question was raised as to how soon delivery could be made upon said machines. Said Osman called up the defendant corporation by long-distance telephone, and, on being told that shipment could be made that day if the order was obtained, he instructed the corporation to make such immediate shipment, and thereupon prepared the contract which was signed by the plaintiff.

By the terms of the written contract the plaintiff was to pay $12,150 for the two dumptors. Of this amount $42 was to be paid in cash upon the execution of the agreement, $3,000 in cash upon the receipt of the bill of lading, and the balance in five separate payments evidenced by promissory notes executed by plaintiff. Upon the execution of the contract the plaintiff also executed his check to defendant corporation for $42, and delivered it to said Osman. The dumptors arrived at Jamesport, Missouri, on May 4, 1930, but the bill of lading with draft for $3,000 attached thereto was by mistake sent to one Herman M. Brown Company at Des Moines, Iowa, instead of to Jamesport, Missouri. The plaintiff was anxious to get said machines on the job, and got in touch with Carl A. Nyquist, vice president of the Rock Island Railroad, with whom he was acquainted, and upon his promise to take up the bill of lading when it should be found, was allowed to take the machines off the cars. Upon discovering later that the bill of lading with the draft attached thereto was at the place of business of the Herman M. Brown Company in Des Moines, Iowa, plaintiff went there on the 16th day of May, 1930, and paid the $3,000 to cover the draft, in accordance with the terms of the contract. By an arrangement between the defendant corpora-

tion and Herman M. Brown Company, the latter company was to finance the deal, and, after the machines had been received, the plaintiff, while in the office of the Brown Company, executed the notes covering future payments called for by the contract and also executed a chattel mortgage upon the machines to secure same.

The machines were placed in operation upon the job on the 5th day of May, 1930. According to the evidence introduced by the plaintiff, these machines gave trouble almost from the start. This trouble continued, and about the 26th day of June, 1930, plaintiff discontinued using one of the machines. He discontinued the use of the other machine about the 9th day of July, 1930, and shortly thereafter told a representative of the defendant corporation in substance that he would have nothing further to do with them and that they were at the disposal of the defendant.

On or about the 5th day of August, 1930, plaintiff was called to the office of the Brown Company in Des Moines, where he met Mr. Brown, Ralph Osman, who was the inventor of the dumptor and a brother of K. R. Osman and had charge of the sales department of the defendant corporation, and a Mr. Diamond, who was a representative of the defendant corporation. The evidence is in dispute as to what occurred at this meeting. According to the evidence of Brown, Osman, and Diamond, an agreement was entered into by which the defendant would take back the dumptors and retain the money which had been paid, but would release the plaintiff from all further payments. According to the testimony of the plaintiff, he refused to have anything further to do with the dumptors, told Brown, Osman, and Diamond that his contract in Missouri would be completed in a few weeks and that they should decide what to do with the dumptors before he left the job, and demanded the return of the money paid by him and the notes which had been given by him for the future payments, but no definite agreement was entered into. On August 23, 1930, plaintiff wired the Brown Company stating that he had notified them two weeks previously to take care of dumptors before he left camp; that he had received no word from them; that he would leave camp in a few days; and asked them to take care of this matter at once and notify him at Trenton, Missouri. On August 27, 1930, the Brown Company wired plaintiff to return dumptors to them at Des Moines. On September 6, 1930, the dumptors were

shipped from Jamesport, Missouri, to the Brown Company at Des Moines, Iowa.

Nothing further seems to have occurred between the plaintiff and the defendant in reference to this matter until about the 20th day of November, 1930, when the plaintiff, through his attorney, wrote to the defendant corporation demanding the return of the money paid and the return of the notes which had been executed by him. Upon the refusal of the corporation to comply with this demand, plaintiff instituted this action.

Plaintiff's petition was in two counts. In one count he pleaded an implied warranty, and in the other he pleaded fraud in the execution of the contract. The defendant in its answer denied the implied warranty and the fraud alleged by plaintiff, and further pleaded several special defenses which are the basis of the errors relied on for reversal in this appeal and will be hereafter referred to in this opinion.

The case was tried as an equity action, and the trial court found for the plaintiff, entered judgment against the defendant for the full amount of money paid to it by plaintiff, with interest, and ordered that the contract between plaintiff and defendant, the mortgage given by plaintiff to defendant, and the notes given by plaintiff to defendant, be rescinded. From this decree the defendant appeals.

The abstract of evidence and a denial of this abstract and an amended abstract comprise more than five hundred printed pages. It is obvious that it would be impossible to set out the evidence in this case, and all that we will attempt to do is to state our conclusions as to matters which have been argued.

I. The first question to which our attention is directed is that of warranty. In our discussion we shall confine ourselves to the question of an implied warranty. It is contended by appellant that there can be no implied warranty in this case, because the written contract states that it contains the entire agreement and because a warranty will not be implied in conflict with the express terms of the contract. The case of Ideal Heating Company v. Kramer, 127 Iowa 137, 102 N. W. 840, 842, involved a similar provision in a contract, and, in passing upon the claim made therein that this precluded the evidence of an implied warranty, we said:

"The clause of the contract which provides that the writing, when signed, 'shall fully express the agreement between the parties hereto,' is nothing more than a paraphrase of the long-settled rule

of law that the writing is presumed to contain the entire agreement, and parol evidence is not admissible to vary its express terms. It does not exclude an implied warranty where one would otherwise be found."

Appellant further contends that, under the provisions of section 9944 of the Code of 1927, there can here be no implied warranty as to the fitness of the machines for the purpose for which purchased by plaintiff, because there is no showing that the plaintiff made known to the defendant the particular purpose for which the machines were required. In this connection appellant contends that K. R. Osman was not an agent of the defendant, and that there is no showing that any conversation had by the plaintiff with K. R. Osman was made known to the defendant before the contract was entered into. A considerable portion of appellant's brief and argument is taken up in the attempt to show that K. R. Osman was an employee of a concern known as the Van Keppel Company of Kansas City, and not of the defendant. A reading of all the evidence, however, convinces us that, whatever relation said Osman may have had with the Van Keppel Company, as to the transaction herein involved there is ample evidence to show that he was acting as agent and representative of the defendant corporation. It appears in the evidence that said Osman had been in touch with the grading job in question for some time before the execution of the contract between the plaintiff and defendant; that, during that time, he had ridden up and down the job, knew the nature of the materials which were being moved and the work that was being done, and had endeavored to make sales of dumptors to other contractors engaged upon this work. It does not appear that in his negotiations with the plaintiff, or in his talk with the other contractors, he ever held himself out to any of them as the agent or representative of the Van Keppel Company. At the time the contract between the plaintiff and defendant was entered into, said Osman had forms of defendant corporation's contract with him. He not only knew from his own personal observation the nature of the work being done, but the evidence shows that the plaintiff placed particular stress upon the nature of the work being done and the necessity of machines capable of handling the materials which were being moved. The evidence further shows that, after considerable discussion between plaintiff and Osman as to the kind of work the dumptor would do and the kind of work appellee was required to do under

his grading contract, and before the contract to purchase the dumptors was signed by the appellee, said Osman got in communication with the appellant corporation by long-distance telephone and arranged for the immediate shipment of the two dumptors, and that shipment was immediately made by appellant in compliance with the arrangement made by him, and without waiting for the arrival of the written contract which was later signed by the appellant. The contract which was later made out by Osman and signed by plaintiff was made with the appellant on blank forms of the appellant, and Osman signed his name as salesman on the copy of this contract that was left with the appellee. We believe this evidence is sufficient to show the agency of Osman and that the knowledge of Osman as to the purpose for which the dumptors were required should be imputed to his principal, the defendant. In 2 C. J. 859, it is said:

"Subject to the qualifications hereafter considered, it is a well settled general rule that a principal is affected with constructive knowledge, regardless of his actual knowledge, of all material facts of which his agent receives notice or acquires knowledge while acting in the course of his employment and within the scope of his authority, although the agent does not in fact inform his principal thereof."

See, also, Ware & Leland v. Heiss, 133 Iowa 285, 110 N. W. 594.

Moreover, there is sufficient in the evidence to show that these dumptors were being sold by the defendant corporation for use in the same kind of work that was being done by the plaintiff, and nowhere in the evidence does it appear that any claim is made by appellant that the difficulties experienced in connection with the two dumptors in question were due to the nature of the materials being moved or the nature of the work which was being done. All the evidence in this regard shows that it is the contention of the appellant corporation that the troubles experienced by the plaintiff were due to the carelessness or inexperience of the persons operating these dumptors and not to any unfitness of the dumptors for the work in which they were used. In our opinion, the said Osman was the agent of the appellant corporation, and in the contract evidencing the sale of the dumptors by said defendant corporation to the plaintiff there was an implied warranty that the dumptors were fit for the purposes for which purchased.

■ Appellant further contends that the dumptors were purchased as specific patented articles designated by their trade-name, and that there can be no implied warranty when an article is sold under its patented or trade-mark name. The rule contended for by appellant, however, is not in our opinion applicable to the facts of this case. While it is true, as a general rule, that the sale of a specific patented article known to the trade under its patented or trademark name does not include an implied warranty as to its fitness for the purposes for which the purchaser expects to use it, the mere fact that the subject of a purchase is a patented article does not bring it within this rule. As stated in 55 C. J. p. 757:

"The fact that an article has a trade name does not negative the existence of an implied warranty of fitness for a particular purpose when it is purchased, not by name, but for a particular purpose and supplied for that purpose; and where the buyer relies not upon the trade-mark but upon the seller's judgment, there is an implied warranty of fitness for a particular purpose."

The facts of this case show that a dumptor was a comparatively new machine, that it was not generally known to contractors, and that the plaintiff in this case had no knowledge whatever of the working of this machine, and that in making the purchase in this case the plaintiff did not purchase a known article by its patented name, but that the purchase was made only after the machine had been explained to him by the defendant's agent, and in reliance upon the seller's judgment. See, also, Iron Fireman Coal Stoker Co. v. Brown, 182 Minn. 399, 234 N. W. 685, and cases therein cited.

Upon the trial of the case much evidence was introduced by the plaintiff to show that the dumptors were entirely unfit to perform the work for which purchased. The defendant endeavored to show that such dumptors were fit and efficient machines to do the work which plaintiff had to do, but that the difficulties were caused by carelessness or inexperience of the operators of said machines employed by the plaintiff. It would answer no purpose to try to review the evidence of these witnesses, and would extend this opinion to unnecessary length. It is sufficient to say that the evidence, not only of the plaintiff and of his employees, but of other persons who were in touch with the work being done by the plaintiff, shows very conclusively that either or both of the dumptors in question were out of use because of some breakage or defect during a great part of

the time the plaintiff was attempting to use them. In our opinion the evidence indicates that the dumptor was still in an experimental stage when these machines were sold to appellee. We believe the evidence satisfactorily establishes the fact that these dumptors were not fitted for the purpose for which they were purchased by the plaintiff, and that the implied warranty of such fitness was therefore breached.

II. It is further contended by appellant, however, that, regardless of the question of warranty or fitness of the dumptors for the work for which they were purchased, the appellee cannot recover in this action because he entered into a contract of settlement with the appellant-corporation by the terms of which he agreed to return the dumptors to appellant and allow appellant to retain the payments which had been made and that appellant in turn agreed to take back the machines and hold appellee harmless on the notes for the deferred payments. It is alleged that this agreement took place in the office of Mr. Brown of the Brown Company in the city of Des Moines on the 5th day of August, 1930.

There is no question that a meeting occurred at that time at which the plaintiff was present, and that there were also present, in addition to Mr. Brown, Ralph Osman, who was the inventor of the dumptor and a brother of K. R. Osman, and a Mr. Diamond, who was a representative of the defendant corporation. A careful examination of the evidence in regard to what occurred at this meeting does not satisfy us that there was any such agreement as is contended for by the appellant. The subsequent conduct of the parties leaves this question in still greater doubt. Even if there had been such an agreement, however, it is argued by the appellee that such agreement would have amounted to an accord, and that there has never been any satisfaction of the accord, because the notes given by plaintiff were never returned to him or tendered to him until the trial of this case. Appellant in its reply argues that there is no question of an accord and satisfaction, for the reason that at the time the alleged agreement of August 5th was entered into the notes which the appellant had received from the appellee had been disposed of and assigned by it without recourse, and that the appellant therefore had no further interest in the notes or in the transaction. Appellant further contends that the alleged agreement could not be considered as an accord because accord and satisfaction is primarily a matter of defense to be interposed by a debtor in a suit brought

by a creditor, and that the appellant was no longer a creditor of the appellee. Appellant cites no authority in support of this contention contained in its reply, and we are unable to see the force of its argument.

Before and up to the time the alleged agreement of August 5th is claimed to have been made, we think the evidence quite clearly establishes that appellee was not satisfied with the dumptors and was demanding the return of his notes and the money paid by him. Regardless of what disposition the appellant had made of the notes given to it by appellee, the appellee was claiming the right to the return of these notes and of the money which had been paid to appellant, because of the breach of the implied warranty in the contract under which the dumptors had been purchased. If, under these circumstances, the agreement claimed by the appellant was entered into and appellee agreed to accept the return of his notes in full satisfaction of his claims against the appellant, we see no reason why this should not amount to an accord as defined in 1 C. J. 523, wherein it is said:

"An accord is an agreement whereby one of the parties undertakes to give or perform, and the other to accept in satisfaction of a claim, liquidated or in dispute, and arising either from contract or from tort, something other than or different from what he is or considers himself entitled to; and a satisfaction is the execution of such agreement."

Appellee denies that there was any such agreement as claimed by appellant. Ralph Osman at first testified that the appellee's notes were to be canceled, but later said he did not recall the language used. Brown and Diamond claimed nothing was said about canceling or returning the notes. If there was any such agreement, regardless of what language may have been used, in view of what we think the evidence shows the appellee's attitude to have been up to that time, we think it is quite apparent that, as one of the essentials of such agreement, the appellee would have insisted that he be released from all liability upon the notes which had been given by him. Such release from liability could not be complete until all possibility of liability on the notes had ceased to exist, and this could only be done by a written cancellation on the notes, by destroying them, or by returning them to the appellee. So far as the record shows, none of these things was done, and no offer or attempt was

made by the appellant to return the notes or to furnish appellee with any evidence that they had been canceled until upon the trial of this case. Therefore, even if the agreement claimed had been entered into, which we think the evidence fails to show, it must have been in lieu of liabilities growing out of the former agreement and therefore, an accord; and, as such accord was not satisfied within a reasonable time, the appellant cannot now avail itself of the benefit thereof.

III. Appellant further contends that in no event can the appellee rescind the contract because the evidence shows that he accepted the dumptors when shipped to him and continued to use the same and made a payment thereon after a discovery of the breach of the warranty of which he now complains, that no attempt was made to rescind until after the appellee was in default, and that he has not restored the appellant to the *statu quo*. It is true that the appellee accepted the dumptors and continued to use them for a considerable time after he claims he found them unfit for the work which he was doing. Appellee contends, however, and we think the evidence supports his contention, that he expressed his dissatisfaction with the dumptors and told appellant's representative that in his opinion they were unfit for the work very shortly after putting them on the job, but that he was induced to retain them and give them a further trial because of the importunities and promises made to him by the defendant and its representatives. The payment made by appellee was of the draft attached to the bill of lading, which he had promised Mr. Nyquist he would pay when found, and it also was paid after the assurances given him by the appellant's representative that the dumptors would be made to work satisfactorily. The evidence also shows that the continued use of the dumptors by the appellee until after one or more of his notes given in payment therefor was in default was also due to the request of the appellant that the dumptors be given a further trial and to the appellant's promises that they would be made to work satisfactorily and to comply with the implied warranty. In our opinion, the continued use of the dumptors by the appellee was at the request and in reliance upon the promises of the appellant, and, under the circumstances, we do not now feel that he should be estopped from the right to rescind the contract.

Finally, it is contended by the appellant that there can be no rescission because the appellee failed to restore the appellant to

*statu quo.* Appellant contends that, the dumptors having been delivered to the appellee at Jamesport, Mo., it was incumbent upon the appellee, in order to rescind the contract, that such dumptors be returned to the appellant at the place of delivery in as good condition as they were received. Appellant contends that the evidence shows that both machines were allowed to go over the dump and fall a considerable distance, and that there is evidence to the effect that there was a collision between the two dumptors, and that the condition of the dumptors was therefore not as good as when received by appellee. Much of the evidence referred to by the appellant is hearsay and cannot be considered, but, even if all of such evidence were competent, we think the evidence of the appellee is overwhelmingly to the contrary. We believe the evidence amply sustains the contention of the appellee that the dumptors were not abused or carelessly operated and that the breakage which occurred upon the same was due to defects or to unfitness of the dumptors for the purpose for which they were sold to him. The evidence further shows that the appellee had expended large sums of money in repairing the dumptors, and that, with the exception of a cracked frame and possibly some other damaged parts which were due either to defects in the dumptors or to their unfitness to perform the work for which they were sold, the dumptors were in practically as good condition as when received by the appellee.

We think the evidence further sufficiently shows that the appellee repeatedly told the appellant or its representatives that the dumptors would not be retained by him, and that, after many attempts to repair them and place them in working condition, the appellee finally notified the appellant that he would have nothing further to do with the dumptors and that they were at appellant's disposal. There is nothing in the evidence to indicate that either the appellant or any of its representatives ever suggested to the appellee that he should return the dumptors to the depot at Jamesport or to any other place. On the contrary, the evidence indicates that the appellant by its conduct refused to accept a return of the dumptors and continually insisted upon the appellee retaining the same. In Lake v. Silo Co., 177 Iowa 735, 158 N. W. 673, 674, it is said:

"In various forms, it is contended that the court erred in permitting a recovery by plaintiff, for the reason that it was not alleged in the petition, or proved upon the trial, that he had returned, or offered to return, the silo, to the place where he received it. He

received it at the depot in the town of Gaza, and hauled it to his farm, at least a quarter of a mile away, and he did not return it to the depot. Plaintiff does not expressly allege a return, or an offer to return, the silo. The statement made by him was that defendant was duly notified that said materials were held by plaintiff at its, (defendant's) risk. He proved that he told defendant's agent that he would not accept the silo; that they could take it; and that it was there (at the farm), subject to their order. The telegram which plaintiff sent the defendant has already been referred to, and this constituted no more than a refusal to accept the property. Defendant admitted, however, that it received a letter from plaintiff's counsel, before suit was brought, that the machine was there at its (defendant's) risk. Was this a sufficient tender, or offer to return the silo? The general rule is, that, if a buyer rescinds a contract of sale, he must return, or offer to return, all that he has received under the contract; and the tender, or offer, should be to return the property to the place where the property was received by the buyer; and, to make out a case for rescission, such tender must be pleaded, or an offer to return must be made in the pleadings. National Imp. & Const. Co. v. Maiken, 103 Iowa 118, 72 N. W. 431; Eadie v. Ashbaugh, 44 Iowa 519; Lunn v. Guthrie, 115 Iowa 501, 88 N. W. 1060; McCorkell v. Karhoff, 90 Iowa 545, 58 N. W. 913. As the law does not require the doing of vain things, if the seller refuses to accept the goods when offered, or indicates a purpose not to rescind, if tendered, no formal tender is necessary. Olson v. Brison, 129 Iowa 604, 106 N. W. 14."

As stated in the above citation, the law does not require the doing of vain things, and, under the circumstances and in view of the conduct of the appellant, we do not feel that there was any duty upon the part of the appellee to return the dumptors to Jamesport or to any other place, because he had ample reason to believe that the same would not there be accepted by the appellant.

For the reasons given above, the decree and judgment of the trial court is hereby affirmed.

ALBERT, C. J., and EVANS, KINDIG, and CLAUSSEN, JJ., concur.