**HUNT TRUCK SALES AND SERVICE, INC., Plaintiff,**

v.

**OMAHA STANDARD, Defendant.**

**Civ. No. 1–300.**

United States District Court,
S. D. Iowa, W. D.

Oct. 13, 1960.

Raymond A. Smith, Philip J. Willson, Council Bluffs, Iowa, and Fred T. Saussy, Jr., Tampa, Fla., for plaintiff.

Addison C. Kistle and Maynard S. Telpner, Council Bluffs, Iowa, for defendant.

STEPHENSON, District Judge.

Plaintiff, Hunt Truck Sales and Service, Inc., hereinafter referred to as Hunt, a Florida Corporation and dealer in trucks and trailers in that State, purchased two bulk dry cement trailers from the defendant, Omaha Standard, an Iowa Corporation and manufacturer of truck bodies and trailers in Council Bluffs, Iowa. Plaintiff brings this action, claiming rescission of this sale to recover back the purchase price paid the defendant and transportation expense expended by it, less $1,201, rental charges collected by the plaintiff from its purchaser, Tank Truck Rentals, Inc., or its affiliate, Florida Tank Lines, Inc., hereinafter referred to as Florida Tank, for the use of the trailers during the time they were in operation, thereby making a net claim of $11,149. This matter proceeded to trial before this Court sitting without a jury.

The parties agree that the law of the State of Iowa is applicable to this transaction, which under the facts appears to be the correct view. Although lengthy negotiation between the parties took place through the mails, by telephone, and by telegraph of an informal nature, on June 23, 1956, G. L. Tate, Vice President of defendant, Omaha Standard, sent a letter to plaintiff setting forth the specifications and price of the trailer discussed to date as a tentative proposition. On July 13, 1956, a telegram was sent by plaintiff, Hunt, in Florida to defendant in Iowa advising it to "proceed with order." This telegram appears as the first correspondence after the letter of June 23rd. It is undisputed that plaintiff's telegram was an acceptance of the offer contained in defendant's letter of June 23rd. Delivery to the plaintiff was to take place in Iowa at Council Bluffs where the trailers were manufactured.

As this action is based upon diversity of citizenship, this Court must apply the Iowa conflict of laws rules. Klaxon Co. v. Stentor Electric Mfg. Co., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L. Ed. 1477; Aluminum Co. of America v. Hully, 8 Cir., 1952, 200 F.2d 257; Fire Association of Philadelphia v. Allis Chalmers Mfg. Co., D.C.N.D.Iowa 1955, 129 F.Supp. 335.

Under the Iowa law it is indisputable that where the contract was to be performed wholly within the state and the place of contracting was that state, its substantive laws will be controlling. Elk River Coal & Lumber Co. v. Funk, 1937, 222 Iowa 1222, 271 N.W. 204, 110 A.L.R. 1415; Liljedahl v. Glassgow, 1921, 190 Iowa 827, 180 N.W. 870.

As stated above this sale was to take place wholly in Iowa, also the contract of sale would be considered made in Iowa as the Iowa law deems the place of acceptance, the last act necessary to complete meeting of the minds, to be the place of contracting. Haverly v. Union Construction Co., 1945, 236 Iowa 278, 18 N.W.2d 629; Burch Manufacturing Co. v. McKee, 1942, 231 Iowa 730, 2 N.W. 2d 98; Chicago, R. I. & P. R. Co. v. Lundquist, 1928, 206 Iowa 499, 221 N.W. 228; County Savings Bank v. Jacobson, 1927, 202 Iowa 1263, 211 N.W. 864.

The Iowa Court has ruled that when the acceptance is sent by a medium other than that by which the offer was received and its use was not otherwise authorized by the offeror, acceptance is deemed to take place at the point where

the acceptance is received. In Lucas v. Western Union Telegraph Co., 1906, 131 Iowa 669, at page 675, 109 N.W. 191, at page 193, 6 L.R.A.,N.S., 1016, at page 1020, the Iowa Supreme Court stated:

> "It is very evident on authority and principle that, in the absence of any suggestion, one transmitting an offer by mail cannot be bound by an acceptance returned in some other way until it is received or he has notice thereof."

Here, by the Iowa rule, plaintiff in accepting by telegram in lieu of mail is deemed to have accepted at the point of receipt, Iowa. Therefore, the contract was made in Iowa.

Plaintiff grounds his action and the rescission on Section 554.70, subd. 1, par. d, Code of Iowa 1958, I.C.A., which creates this remedy for breach of warranty. Plaintiff alleges two distinct grounds: Breach of an express warranty, and breach of an implied warranty of fitness for a particular purpose.

There being no evidence introduced on the point of breach of an express warranty, plaintiff abandoned this ground, thereby leaving only the issue of the implied warranty and its breach for determination.

Section 554.16, subd. 1, Code of Iowa 1958, I.C.A., provides as follows:

> "Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment, whether he be the grower or manufacturer or not, there is an implied warranty that the goods shall be reasonably fit for such purpose."

■ Our inquiry is simply does this section apply to the facts as shown, that is: (1) did the buyer make known to the seller the purpose for which the goods were to be used and (2) did the buyer rely on the seller's skill and judgment. Under Iowa law these two elements must be satisfied in order to establish the implied warranty of fitness for a particular

purpose. Davenport Ladder Co. v. Edward Hines Lumber Co., 8 Cir., 1930, 43 F.2d 63; Drager v. Carlson Hybrid Corn Co., 1952, 244 Iowa 78, 56 N.W.2d 18; see also, Brandenberg v. Samuel Stores, 1931, 211 Iowa 1321, 235 N.W. 741, 77 A.L.R. 1161.

It appears that Florida Tank became interested in hopper bottom type bulk cement trailers as a means to speed and simplify its operation of hauling bulk cement for its customers. Plaintiff, Hunt, from whom Florida Tank had purchased conventional auger type trailers previously, was contacted to supply this type of trailer. Three years previously, plaintiff Hunt had occasion to obtain information from the defendant, Omaha Standard, on a hopper type trailer for hauling lime which Omaha Standard manufactured. With a similar basic design in mind, Hunt contacted Omaha Standard, explained essentially what was needed and Omaha Standard responded by making initial suggestions and drawings, and ultimately sent Mac Hickman, its sales manager, down to Florida to discuss the matter in detail with all the parties concerned.

Hickman spent several days discussing Florida Tank's operation and facilities with Frank R. Gernert, Vice President of Florida Tank, and observing these facilities and general operations. Both James Walker, Vice President of Hunt and Gil Ryder, a salesman for Hunt, individually spent a day showing Hickman around these various points. Hickman was shown loading and unloading facilities of Florida Tank's customers, as it would be necessary to make modifications in these to accommodate hopper bottom trailers.

Hickman then went back to Omaha to discuss the "non standard points" with one Shadwick, Omaha Standard's engineer, who agreed workable trailers could be made. Later Hickman sent down exact specifications for the unloading ramp to be built for use in connection with the trailers.

Under the facts as outlined above, it is apparent that Omaha was cognizant of

the purpose for which these specially made trailers were to be used by Hunt and by the ultimate purchaser, Florida Tank. It should be noted that this is not to say that the particular purpose involved is resale to Florida Tank and their complete satisfaction, but resale to Florida Tank and reasonable fitness to perform as a hopper bottom bulk cement trailer in their particular operation, regardless of any representation between Hunt and Florida Tank unknown to Omaha Standard as discussed later.

■■ As to Hunt's reliance on Omaha Standard's skill and judgment, it is noted that the Iowa Courts have held that it is not necessary to show reliance by affirmative testimony of the buyer that he did rely, but "reliance may be shown by the circumstances of the case." Drager v. Carlson Hybrid Corn Co., 1952, 244 Iowa 78, 84, 56 N.W.2d 18, 22. There the Court said at page 83 of 244 Iowa, at page 21 of 56 N.W.2d, "a claim of implied warranty of fitness has more frequently been upheld where the seller is the manufacturer or grower of the product than when he is a mere dealer." (See discussion in Rasmus v. A. O. Smith Corp., D.S.N.D.Iowa 1958, 158 F.Supp. 70, at pages 79–80). Here the seller is the manufacturer, the product is unique and made especially for the buyer; the buyer went to the seller since he knew the seller had previously made a trailer of similar design; the buyer went to lengths to inform the seller completely of the operation in which the trailers would ultimately take part and the manner in which they would be used; the seller even instructed the buyer as to exact specifications, as determined by their engineer, of unloading docks to be built for use with the trailers. Under these circumstances there is substantial evidence to show that the buyer (plaintiff) relied upon the skill and judgment of the seller (defendant) to produce a trailer that would fulfill the specific purpose of their customer, which had been made known to the seller, and the Court therefore finds that the defendant did impliedly warrant that the goods would be reasonably fit for that purpose, that is, the trailers would be reasonably fit for hauling bulk dry cement.

Plaintiff contends that this implied warranty of fitness for a particular purpose has been breached in 7 ways:

"Said trailers were delivered to plaintiff on or about August 20, 1956 at which time and at all times subsequent thereto said trailers have failed to meet the purpose for which they were required in the following particulars:

"(a) The doors in the trailers failed to work properly requiring two to three men to open the doors to unload the cement.

"(b) The tops of the trailers have caved in so that the domes do not close properly.

"(c) Cement leaks from around the hopper doors in excessive quantities.

"(d) There are cracks along the welded seams of the trailers.

"(e) The vents are improperly constructed so as to cause cement dust to back up the chute and blow out into the face of the loaders.

"(f) Excessive amounts of cement accumulates in all four corners of the hopper units.

"(g) An excessive amount of time is required to unload the trailer units."

The plaintiff's customer, Florida Tank, had difficulties with these units from the outset. Upon the first unloading, an event for which Florida Tank had gathered a small number of officials and photographers to observe the change over to this new method, the "butterfly" door which allows the cement to pass out the hopper chute failed to open. It was several hours before these could be pried apart and the load discharged. At the initial loading an excessive amount of cement filtered out and Florida Tank's mechanics had to chink cracks and holes around the doors of the chute.

The defendant contends that these difficulties Florida Tank encountered

arose because of Hunt's failure to instruct Florida Tank in the mode of operation of the units. The butterfly hopper doors, located beneath the hopper consisted of two metal plates, their planes horizontal when closed, on center pivots upon which they could be rotated into a verticle position thereby allowing the cement to flow out of the hopper. To execute the pivoting motion one-half the plate must rotate up pushing into the cement. To facilitate this motion an areation device was installed around the door which, by the use of a compressed air tank, would force air into the cement in that area causing it to become mobile, thereby flowing easily around the door as it is lifted upwards. It seems this method had been successfully used by Omaha Standard on other trucks. Beneath the doors was a "sock" or tubular piece of canvas material made of durable fibres which would funnel the discharged cement into the receiving orifice in the ramp. This sock could be folded upwards against the butterfly doors, and a metal "lid" would then be swung up against the folded sock and latched thereby completely sealing the doors. Admittedly the butterfly doors did not make a tight fit, their main purpose was to hold back the great weight of the load. The folded sock held in place by the metal trap door was intended to complete the seal.

It appears that Florida Tank had no knowledge of the areation device nor of the manner in which the sock and trap door were to be used, but attempted to open these doors without loosening the packed cement around them, a feat which the doors were not designed to do, and relied on these doors solely to seal the hopper bottoms.

Subsequent to this first operation, Florida Tank commenced using the sock apparatus properly, which was another source of complaint in that whoever was unloading would have to get under the trailer to pull it up into position. Florida Tank also made some alteration on the doors themselves, but nowhere does it appear that they ever used the areation device.

After these trailers were used a month, Omaha Standard sent a mechanic down to Florida to work out the problems then existing. Finally the units were returned to Omaha to be reworked. Both Hunt and Omaha Standard were interested in obtaining the very best operative trailer at this point, there being a definite probability that a fleet of these units could be sold in the area.

The relevant alterations Omaha Standard made to the trailers were as follows: They replaced the altered butterfly doors with a single sliding panel type door with a self-sealing neoprene glide, contoured the inside corners of the hopper to lessen the accumulation of residue cement, and added two more hatches on the top, making three in total which were designed to be opened when unloading to relieve the vacuum created by the rapid evacuation of the cement which otherwise might cave in the roof. After the units were finished they were let to stand overnight filled with water. No leakage was apparent the next morning. The first trailer was returned to Hunt November 2, 1956, the second was returned December 4. No complaints were received between November 2 and January 4, 1957, but at that time Omaha Standard was again notified by Florida Tank that difficulties were being experienced. Omaha Standard requested Florida Tank to send a report of the problems and told them they would send down their engineer, W. D. Shadwick, that week to analyze the situation. The engineer arrived in the middle of January 1957 and observed the operations of the trailers. He noted that the neoprene slides had been greased causing cement to gum up and retard the motion of the door; that the roof was caved in as a result of the drivers' failure to open up a hatch when unloading; that there was a leak in the tank, but from a rivet hole which the Florida Tank mechanics said they would fix; that a brace supporting the wheel to open the sliding door was bent but could be remedied with the addition of another

brace the mechanic could install. Shadwick stated that loading and unloading times were respectfully 50 seconds and five minutes, that the drivers and operators seemed satisfied, except they objected to having to get out of the cab to open the hopper door and the hatches (the latter they frequently did not do). In all Shadwick testified that the difficulties complained of could be remedied with "minimum adjustments." He also recognized that an underlying factor of dissatisfaction was the capacity of the trailers which was not as great as Hunt represented to Florida Tank it would be. Omaha Standard would not, of course, have any responsibility in that regard.

Following this, correspondence ensued between the three parties as to modifications which would make for a better unit: Hydraulically operated doors, exhaust vents of capacity so that the hatches need not be opened in unloading, more rounded inside corners in the hoppers, and adjustments in load distribution to increase the capacity of the units, which appeared to be of prime importance to Florida Tank.

In April 1957, Myles Standish, President of Omaha Standard, went to Florida to personally look over the situation. His observations were somewhat similar to Shadwick's. The units were trouble free, but the drivers objected to getting out of the cab to open the hopper. There was only nominal "dusting" as the trailers went down the road, which apparently was from spillage from the loading operation on the top and around the sides of the unit. The main complaint Standish was able to elicit from Florida Tank was that the units would not carry a 140 barrel load as represented to them by Hunt Truck.

From this point on relations continually deteriorated until July 23, 1957, when an attorney for Hunt notified Omaha Standard of an intention to rescind. There is evidence that the units were used by Florida Tank up to that date at least.

Considering all of the evidence this Court finds that the defects complained of lack sufficient substantiality to be a breach of the implied warranty of fitness for a particular purpose. A product need not be perfect but only reasonably fit for the purpose for which they were ordered by the express language of Section 554.16, subd. 1.

Here Omaha Standard and Hunt expended a great effort after the initial delivery of the units to come up with a near perfect trailer in an endeavor to capture a new market. Although this failed, it does not necessarily follow that the units were not reasonably fit for the particular purpose for which they were required. It could well be that an auger type unit is simply more suited to Florida Tank's operation than a hopper unit even though the hopper unit would adequately do the job. It is of great importance that the main, persistent complaint here did not arise from these units' intrinsic ability to haul, load and unload bulk cement, but from their failure to carry as large a load as represented, not by Omaha Standard, but by Hunt; and apparently their failure to be as revolutionary and efficient as anticipated by the disappointed ultimate purchaser, Florida Tank. Perhaps Hunt should have obtained these units as prototypes on an experimental or approval basis until it was determined Florida Tank could use units of this type, at which time a fleet could be purchased. But they did not choose this course. Instead they purchased these units and then resold them to Florida Tank. Although Omaha Standard impliedly warranted them to be fit to perform for Hunt's purpose, they cannot be responsible for Hunt's customer's satisfaction or dissatisfaction which does not stem from an inability of the units to reasonably perform in the capacity warranted to Hunt. To hold otherwise, in light of the evidence of the ability of the units to function, would be to find that Omaha Standard was charged to provide units for the particular purpose of resale to Florida Tank to their complete satisfaction as replacements of the screw type units. Such a warranty could have, un-

der stronger facts been impliedly made, or the seller could have warranted the units to be more economical and efficient than the screw type, but this Court found above that the warranty here was not this inclusive but related only to the units' ability to reasonably function as hopper bottom haulers of bulk dry cement in Florida Tank's operation. If there was a breach it must have been of this warranty. cf. Davis Calyx Drill Co. v. Mallory, 8 Cir., 1905, 137 F. 332, at pages 335 and 338, 69 L.R.A. 973.

The Court need not rest its determination solely here, however, for assuming there was a breach of a warranty, a question of proper rescission arises.

On July 23, 1957, an attorney for Hunt sent a letter to Omaha Standard reiterating the complaints discussed above and stated that: "Under the circumstances Hunt is forced to rescind its purchase agreement with you * * * When the trailers have been received by us, we will further notify you and will make arrangements for their return." No further correspondence was had until October 28, 1957, when the same attorney wrote to Omaha Standard: "It (Hunt) offers to deliver these trailers to you at Council Bluffs, and I will thank you to notify me by return mail where and to whom you wish to have the two trailers delivered. Upon receipt of your advices they will be promptly dispatched to you." To this Omaha Standard replied in a letter of November 4, 1957, to Hunt's attorney that, "we do not recognize" Hunt's acceptance of the units back from Florida Tank or the "attempted rescission" of that sale and "are in no position to advise your client what to do with these trailers."

Section 554.70, subd. 3, Code of Iowa 1958, I.C.A., restricts the buyers right to rescind after delivery:

> "Where the goods have been delivered to the buyer, he cannot rescind the sale if he knew of the breach of warranty when he accepted the goods, or if he fails to notify the seller within a reasonable time of the election to rescind, or if he fails to return or to offer to return the goods to the seller in substantially as good condition as they were in at the time the property was transferred to the buyer. But if deterioration or injury of the goods is due to the breach of warranty, such deterioration or injury shall not prevent the buyer from returning or offering to return the goods to the seller and rescinding the sale."

There is no contention made that the buyer knew of any breach of warranty at the time of acceptance of the goods, so that provision of the statute relating to knowledge of the breach at the time of acceptance would not preclude a rescission here.

■ The letter of July 23rd although containing a notice of intent to rescind did not contain an offer to return the units at that time, and in fact admitted the buyer's inability then to tender the units back, and therefore, under Section 554.70, subd. 3, Code of Iowa 1958, I.C.A., was not an effective rescission. Rasmus v. A. O. Smith Corp., D.C.N.D. Iowa 1958, 158 F.Supp. 70; Henriott v. Main, 1938, 225 Iowa 20, 279 N.W. 110; Butler Mfg. Co. v. Elliott & Cox, 1931, 211 Iowa 1068, 233 N.W. 669.

The later letter of October 28th did contain such an offer in satisfaction of the requirement of Section 554.70, subd. 3.

This leaves but two inquiries left relative to that Section: (1) was the notice of election to rescind given within a reasonable time and (2) were the goods in substantially as good a condition, exclusive of deterioration incidental to the claimed breach, when offered back.

The last personal contact between Hunt and Omaha Standard was in late April 1957 when Standish, President of Omaha Standard, went to Florida. On May 4 he gave Hunt a price on two new modified units. He stated he would take the old ones as trade-ins at full price less the mileage used by the customer. Objections were voiced by Hunt to the

price and on July 11, 1957, Omaha Standard stated unequivocally that they "have gone the limit in attempting to wash this deal out for you." The evidence shows that the units were used by Florida Tank up to the time they were returned back to Hunt, sometime around October 28, 1957. Hunt would have a right to use the equipment a reasonable time to test it, and if Omaha Standard had induced Hunt to continue using the equipment for a trial period while they attempted to remedy any defects, Hunt would not be prejudiced by holding off its decision to rescind until such attempts had been completed. Heyl v. Beadel, 1940, 229 Iowa 210, 294 N.W. 335, 130 A.L.R. 994; Hughes v. National Equipment Corp., 1933, 216 Iowa 1000, 250 N.W. 154; Van Dyck v. Abramsohn, 1932, 214 Iowa 87, 241 N.W. 461; Brennan & Cohen v. Nolan Laundry Co., 1930, 209 Iowa 922, 229 N.W. 321; Four Traction Auto Co. v. Hurni, 1915, 170 Iowa 476, 153 N.W. 102; Fulton Bank v. Mathers, 1913, 161 Iowa 634, 143 N.W. 400.

Here Hunt had ample opportunity to test the equipment from before December 1956 to April 18, 1957, when Omaha Standard's President, Myles Standish, personally visited them. At the time of his visit Standish told Hunt he thought the units were satisfactory. At no subsequent time did Omaha Standard suggest or request that Hunt keep using the trailers. The offer to let them be traded in was stated in definite terms and would not have lulled Hunt into a belief that Omaha Standard would otherwise take them back. But Florida Tank continued using these units for six months after Standish's visit and three months after Omaha Standard told Hunt they were through attempting to "wash this deal out" for them.

The letter of October 28 must be considered the notice of the election to rescind. The prior letter in July, it is recognized, could be a notice of election to rescind, the rescission not being effective until tender of the goods subsequent to the letter. However, the three months' use by Florida Tank and Hunt subsequent to this would in any event waive the effect of this notice as this use is entirely inconsistent with an intention to rescind, and the Court so finds. That a subsequent inconsistent use will waive a rescission is well decided in Iowa. Storck v. Pascoe, 1955, 247 Iowa 54, 72 N.W.2d 467; Butler Mfg. Co. v. Elliott & Cox, 1931, 211 Iowa 1068, 233 N.W. 669; Advance-Rumely Thresher Co. v. Wharton, 1930, 211 Iowa 264, 233 N.W. 673, 77 A.L.R. 1153, and case cited therein.

The question of what is a reasonable time in which to give a notice of rescission under the facts of the case is usually a question for the jury. Blecher v. Schmidt, 1931, 211 Iowa 1063, 1067, 235 N.W. 34, 36; Brennan & Cohen v. Nolan Laundry Co., 1930, 209 Iowa 922, 229 N.W. 321; Chariton Plumbing & Heating Co. v. Lester, 1926, 202 Iowa 475, 210 N.W. 584; National Bank of Decorah v. Robison, 1925, 199 Iowa 1044, 203 N.W. 295.

Upon consideration of all the evidence here, it is the finding of the Court that the plaintiff, buyer, failed to act within a reasonable time in notifying the seller of its final intention to rescind and therefore had there been a breach of the implied warranty, the plaintiff would have been precluded from rescinding.

As to one trailer there is still another defense to rescission dealing with the condition of that unit. Uncontroverted evidence was introduced by the defendant, seller, that one unit is presently of no value whatsoever except for scrap. It appeared that the hopper and top of this unit were removed thereby critically reducing the structural strength of this "frameless" type trailer causing it to collapse. No evidence was put in as to when this modification took place. If the unit was in this condition prior to the letter attempting rescission in October 1957, the rescission is precluded as the unit decidedly was not "in substantially as good condition as (it was) in at the time the property was transferred to the buyer." Section

554.70, subd. 3, Code of Iowa 1958, I.C.A., supra. Four Traction Auto Co. v. Hurni, 1915, 170 Iowa 476, 153 N.W. 102; Bradley & Niconlin v. Palen, 1889, 78 Iowa 126, 42 N.W. 623.

If the modification took place subsequent to the October attempted rescission, even if the rescission would have otherwise been valid, the acts of the buyer in altering the unit would be inconsistent with his relationship as a bailee for the seller under Section 554.70, subd. 5, Code of Iowa 1958, I.C.A., and with his prior act of rescission and under the Iowa authorites cited above the rescission would thereby be voided.

The foregoing opinion will constitute the Court's Findings of Fact and Conclusions of Law here. Rule 52(a) ·Federal Rules of Civil Procedure, 28 U.S.C.A.

It is ordered that judgment shall be entered in favor of the defendant.