STATE OF IOWA, Appellee, v. GEORGE MURRAY, Appellant.

No. 42882.

DECEMBER 15, 1936.

Robertson & Robertson, for appellant.

Edward L. O'Connor, Attorney General, Walter F. Maley, Asst. Attorney General, and Robert B. Organ, County Attorney, for appellee.

ALBERT, J.—The following facts are satisfactorily shown by the record, and most of them were testified to by the defendant as a witness.

On the 6th day of May, 1934, the defendant, together with one McKay and one Ball, left Des Moines for Omaha in a Ford touring car. They reached Omaha about 12:30 or 1 o'clock. They had been drinking liquor. They started back to Des Moines about 4:30 or 5 o'clock on the 7th of May, and reached Avoca about 8 or 8:30 p. m. They went to a restaurant there and had some lunch, and spent all the money they had in the crowd, and then started north out of Avoca on highway No. 7. At the edge of town there was a warehouse belonging to the Iowa state highway commission, where materials were kept for storage. This building faced east on the said highway. Just across the highway and opposite the front of said building one Harry Bailey resided. From his front porch to the highway commission building was about 200 feet.

The defendant testifies:

"Well, as we got out there by that building, Roy Ball, he

noticed that the gasoline was low in the car, and he says, 'I don't believe we have enough gasoline to go anywhere.' '' Ball was driving. ''Ball says, 'There is an old tractor over there, maybe we can get enough gasoline from that tractor to get home on.' '' The tractor was about 100 feet the other side of the building. ''It was his suggestion we should go over and get gasoline from the tractor, so we went over to the tractor and went to examining the tractor. There was no gasoline in the tractor, so when we were going back we got up to this state maintenance garage that had been broken in, and the door of the garage was open that far (indicating) ; but I pulled the door open farther and there was a gasoline pump there, so we took this old can we took from the car, that is, down to the tractor, and I began to pump gas from the pump in the shed; so I filled one small can and handed it to McKay. Then there was a milk can there that set up on a kind of a bench in the garage, so I took that down and was pumping gas into the can when this car drove up, that is, Mr. Nieman and Mr. Graham. My intent when I went into the building was just for gasoline. That was the only thing we had in mind was just to get a little gasoline. Didn't intend to do anything else except get a little gas, that was all. That was our purpose, to get a little gas to go home. We got, I should judge, around maybe two or two and a half gallons there. It was ordinary gas. After I got some gas in the little can I handed it to McKay; he was standing by the doorway; he took the can in his hand and took it out; and then I was filling up the other can, pumping gas in the other can; I couldn't see how much gas I had in the other can when Mr. Graham and Mr. Nieman came to the building; didn't get the can full. I left it in the building. McKay did not have anything to do with the lock. We had a searchlight that we took from the car down with us. We never had any intention of breaking into any building. Ball stayed in the car. That was all he did. When we came around the front of the building there were no lights on the building, and no light was broken by us. I had plenty of liquor in Avoca and before we got to Avoca. I have never said I was so drunk I didn't know what I was doing. *I wasn't so drunk but what I know I didn't break the lock on that maintenance garage door.* I wouldn't call that stealing. Yes, sir, I knew that was stealing that gasoline and that was committing some sort of crime then. When I seen the door was open, I pulled the door open and looked in,

and there was a gasoline pump, and McKay said, 'There is all the gasoline we want,' so we started to pump. When I opened that door and went in the building, gasoline was what we wanted and had the intention of stealing the gasoline when I pushed the door open. Our intention was to get some gasoline when we went into that building. That is what we wanted. I knew that gasoline was not my property when I continued to operate that pump.''

In addition to this testimony, the principal part of which was given by the defendant himself, Harry Bailey, who lives just across the highway, testifies that he could see the lock, or padlock, on the door from his porch where he was sitting. ''It was fairly dark that evening about 9 o'clock. The noise I heard was a loud noise, hammering. I saw the padlock there that evening after it was broken off. I saw Graham pick it up. The clasp was there, the padlock was on the hasp. The light over the garage door was busted, but there was a light from the street corner over there, shining directly on that garage. I saw two men around there. I saw them break the garage door, and when they broke it, it made a noise. After they broke the door they went in the garage. I called Jack Graham on the telephone. He was the foreman for the highway commission at Avoca. He came at once in response to the call. Ted Nieman accompanied him in his car. I went over to the garage with Nieman and Graham. When I got over to the garage I saw that Graham and Nieman had one man.'' (The witness identified the defendant as the one that Graham and Nieman had there at that time.) ''They afterward turned him over to Harry Eckhart, deputy sheriff. The other man ran away. When I heard these two men hammering on the door the light (over the door) was not burning. When I first saw them the light was lit. When these two men first came up to the garage the door was closed. I saw the door open. The hammering stopped before the door opened.''

Graham testifies that he came by the highway commission building about 8 o'clock and all the doors were closed. He responded to Bailey's call, and he and Ted Nieman, in his car, went to the garage. The lights on his car were burning and focused on the door of the garage, and as he drove there one man came running out and ran north. He had a can in his hand. As he went over the fence he dropped the can and ran across the

pasture, running north. "Just about that time another man came out of the door and I grabbed him. That man was the defendant. He came running out of the door." They had a scuffle with him and finally turned him over to the deputy sheriff, Eckhart. Graham also testifies that there were marks on the door where the lock had been pried out, and he found an instrument like a crowbar or a big screwdriver had been driven in back of the lock and pried it out.

Nieman, in a general way, corroborates Graham's testimony.

This is a general outline of the testimony in the case. With such a line of testimony it is useless to question the sufficiency of the evidence to take the case to the jury.

█ █ █ 1. The first error urged is the sustaining by the court of an objection to certain testimony. The defendant was asked:

"How much gasoline did you intend to take from that pump?" and, "You may state whether you intended to take any more gas than enough to take your car to Des Moines."

Objection to this testimony was sustained and properly so, for the reason, if for no other, that the crime of breaking and entering, under the statute, was completed at the time the building was broken and entered, and the amount of gasoline the defendant intended to take after he had broken in was wholly immaterial. If he broke and entered with intent to take the gasoline the crime charged was completed at the time he entered the building. Further than that, this is true because he, in other parts of his testimony, admitted that he intended to take gasoline.

██ 2. Defendant testified, in response to one question:

"We never had any intention of breaking into any building, because I know better than to break into any building, I know that."

On motion the last sentence was stricken out as not responsive. Of course, the general rule is that counsel examining the witness is the only attorney who has the right to object on the ground that the answer is not responsive; but, however that may be, the statement here made was wholly immaterial and could not benefit the defendant if it had been admitted in the light of the testimony that he had already given in the case.

█ █ █ 3. Certificates were admitted showing that the defend-

ant had been previously convicted on charges of felony in Jasper county and in Polk county. The principal point urged against these certificates of prior conviction, under section 13398 of the Code of 1931, is that the statute is unconstitutional. The constitutionality of this statute seems to have been settled in the cases of State v. Brown, 152 Iowa 427, 132 N. W. 862; State v. Dowden, 137 Iowa 573, 115 N. W. 211; State of Iowa v. Jones, (D. C.) 128 Fed. 626. The statute has never been successfully attacked on this ground and seems to have been quite universally held constitutional. See 16 Corpus Juris, p. 1339, sec. 3151. More than that, to successfully attack the same (if it can be successfully attacked), it is the duty of the defendant to set out the certified record, which he has failed to do.

■■■ 4. Defendant argues that because the amount of gas that was taken would not exceed more than one dollar in value he was only guilty of petit larceny, under section 13008 of the Code. We have answered this question heretofore, when we said that the amount (or value) of the property stolen is wholly immaterial in a charge of this kind.

5. The court gave an instruction defining reasonable doubt against which objection is lodged. The high intelligence of courts and counsel have struggled since time immemorial to make a satisfactory definition of this term "reasonable doubt". We will not attempt to make one, but will simply say in response to this complaint that the instruction given here corresponds to the many instructions heretofore approved by this court.

■■■ 6. Complaint is also made because the court refused to give an instruction on drunkenness as a defense, on the theory that the defendant was so thoroughly intoxicated that he could not have had an intent. While there is evidence of indulgence in intoxicating liquors by these people in this car, at the same time, passing the question of whether or not drunkenness could be a defense, we think the record, even under the defendant's own admissions, such that the court would not have been warranted in giving a specific instruction on drunkenness. This is especially true in the light of the defendant's own testimony: "I wasn't so drunk but what I know I didn't break the lock on that maintenance garage door."

7. Defendant claims that the court should have considered his own testimony alone on the question of breaking and entering. Of course, this is not the rule; but the defendant's own testimony,

giving it the most weight, is that when he approached this building the door was partly open and he pushed it open and entered the building. We have held that even though the door was partially open, by opening it farther, in order to enter the building, this is a sufficient breaking to comply with the demands of the statute. See State v. Sorenson, 157 Iowa 534, at page 542, 138 N. W. 411.

■■■ 8. Defendant also urges error because the indictment charged among other things that this breaking and entering occurred in the nighttime. This is purely surplusage and wholly immaterial, because Code, section 13001 reads:

"If any person, with intent to commit any public offense * * *; or at any time break and enter any office, shop, store, warehouse * * *, or any building in which any goods, merchandise, or valuable things are kept for use, sale, or deposit, he shall be * * *."

Under this latter part of the section the time of the breaking and entering is not a material element.

■■■ We might say in closing this opinion, that the defendant has failed to comply with Rule 30 in making his brief and argument. This rule requires that the writer must first set out in haec verba what the court did and his objections thereto. For instance, one of the assignments of error here is:

"Defendant-appellant duly requested the court to submit to the jury Instruction IV (p. 25, 1.24 to p. 26, 1.8, Abs.) which is hereby referred to and made a part hereof by this reference as fully and completely as though literally set forth herein."

This does not comply with the rule. The purpose of the rule is to have the error relied on set out in detail so as to avoid the necessity of turning back to the abstract. When the defendant referred to instruction IV the same should have been set out in full at that point.

We have carefully reviewed this case and find no error in the record.—Affirmed.

ANDERSON, DONEGAN, KINTZINGER, HAMILTON, STIGER, and RICHARDS, JJ., concur.