JOHN TURNER et ux., appellants, v. DONALD D. KUNDE et ux., appellees.

No. 51311.

(Reported in 128 N.W.2d 196)

May 5, 1964.

Rehearing Denied July 16, 1964.

Stanley, Bloom & Mealy, of Muscatine, for appellants.

William B. Norton, of Lowden, and Newport, Wine & Schebler, of Davenport, for appellees.

Thompson, J.—Plaintiffs' petition prayed for judgment upon certain promissory notes executed to them by the defendants, and the foreclosure of mortgages securing the notes. The defendants counterclaimed, alleging the sale of certain cattle to them by the plaintiffs, with warranties both express and implied; the breach of said warranties, and damages sustained thereby. Before the trial, judgment was entered for the plaintiffs on their cause of action in the stipulated amount of $13,270.81. The stipulation further provided that no execution should be issued on this judgment, and no mortgage foreclosures had, until the trial of the issues raised by the defendants' counterclaim. The cause then proceeded to trial upon the counterclaim, with a resulting judgment for the counterclaimants in the amount of $21,294.31. The counterclaimant defendants, the original plaintiffs, appeal. No appeal is taken from the judgment in favor of plaintiffs on the notes. For the purpose of brevity we shall hereinafter refer to the counterclaimants, the original defendants, as the plaintiffs; and to

the counterclaimant defendants, the original plaintiffs, as defendants.

On July 11, 1959, the defendants sold to the plaintiffs 174 head of Oklahoma range cattle. The negotiations and agreements leading up to the sale were entirely oral, except for one writing claimed by the defendants to be a part of the contract to which reference will be made later. The plaintiffs had some unused pastureland which they desired to lease; but the defendants, through John Turner, who spoke and acted for both and will be known hereinafter as the defendant, entered into negotiations with them leading up to the sale of the cattle, which there is evidence to show he told them would do well and make substantial gains upon the pasture. However, the plaintiffs now claim the cattle were not healthy and made no increase in weight although they were fed commercial feeds and grain in addition to having adequate pasture and water. Whether there was a warranty, express or implied, and if there was, whether it was breached are the first questions to be answered on this appeal.

■ I. We think there was an implied warranty of fitness for the purpose for which the cattle were purchased. They were intended to be feeder cattle, and the entire course of the negotiations shows that the defendant knew this. This means they were to be healthy and capable of putting on weight and making an orderly development to market condition. Section 554.16(1), Code of 1958; Breitenkamp v. Community Cooperative Association, 253 Iowa 839, 842, 114 N.W.2d 323, 324.

■ The defendant contends, however, that there was a specific disclaimer of liability of which the plaintiffs had notice. This is found in a sales slip, which was delivered to the plaintiffs and which unmistakably contains a specific disclaimer of any warranty or other liability. But the plaintiff Donald D. Kunde testified that this was not delivered to him until the cattle were shipped and received. He terms it a "weigh slip". His testimony shows that the contract for the purchase and sale had been made and the notes given for the purchase price signed some time before this. Obviously, if this is true, a disclaimer after the agreement had been made could not vary

it. Goltz v. Humboldt Livestock Auction, Inc., 255 Iowa 1384, 1389, 125 N.W.2d 773, 775.

■ II. The question whether there was a breach of the implied warranty is a more difficult one. Here we must keep in mind that the warranty was of quality; that is, that the cattle were fit for the purpose for which the purchaser intended them. There is some contention by the defendant that the buyers relied upon their own judgment rather than any representation or warranty by him; but this was at best a jury question. Drager v. Carlson Hybrid Corn Co., Inc., 244 Iowa 78, 84, 56 N.W.2d 18, 22, and citations.

The parties contend at length whether there was sufficient evidence that the cattle, when purchased, were afflicted with two diseases: first, anaplasmosis, and second, a heavy infestation of worms. These facts appear in the record with little, if any, dispute: that the cattle were thin and underfed at the time of delivery which was apparent to plaintiffs; that they were at once placed on good pasture; an additional diet of commercial feed and grain was supplied; they had plenty of water available; and that they did not gain in weight in several months following. Seventeen of them died; one or two possibly being struck by lightning. Veterinarians were called at various times; but perhaps because of their unfamiliarity with the disease of anaplasmosis, which is not common in Iowa although well known farther south, it was not diagnosed or suspected until October. Tests were made for other cattle diseases which were negative. In October a test was made, apparently from the tissues of a dead steer, which disclosed a "suspicion" of anaplasmosis. The test also showed worm infestation, but how severe this was does not appear.

The cattle had been observed by Dr. M. O. Pitcher, a veterinarian from Maquoketa, in September. He said: "The cattle were not in good condition. I would call them thin with the feed available and the grain that they were getting. * * * I would say they were poor doers." Dr. K. H. Randolph, a veterinarian from Lost Nation, was called to the plaintiffs' farm to inspect and treat the cattle about ten times, beginning on October 25, 1959. He treated 92 cattle there. He testified:

"Some of them looked all right, but there was a lot of them looked awful poorly, of course that is a relative term. * * * They looked poorly."

Doctor Randolph took tissues from a steer that died and had the tests made which resulted in a finding of suspicion of anaplasmosis and a positive finding of worms. Dr. William M. Lynch, a consulting veterinarian from Cedar Rapids, who was called by Doctor Randolph, visited the plaintiffs' farm in November. He says: "The cattle I was able to examine closely were quite anemic and yellowish or jaundiced. They were thin, they were weak * * *. There is no question in my mind but what they had anaplasmosis."

Dr. J. R. Hasler, a veterinarian from Maquoketa, who had had training and interneship in Kansas, testified as an expert. He did not see the cattle. He said that anaplasmosis is fairly common, about like hog cholera is in Iowa, in states farther south. He also testified that worm infection is more common and more severe in Kansas and Oklahoma. Worm infection is harmful to the animal in proportion to its severity. If the animal was infected with worms, ate a lot but could not gain weight, this would tend to indicate that he had a heavy infestation of worms. Further: "* * * it would appear in my best judgment that these animals had to have this condition [worms] before they left, providing, as I understand it, they were in shipment about a week or ten days or so. Five days seems to me too short a period of time to become emaciated to the condition that you describe. I assume that they had to have them before they left Oklahoma."

The defendants urge that the showing as to anaplasmosis is insufficient because it relates to a period some three and one-half months after the cattle were purchased, and there is no showing as to how many of them were diseased at anytime. As to the worms, it is contended the test did not show whether the infestation was heavy; that most feeder cattle have worms to some extent without resulting damage; and again there is no showing as to how many were thought by the experts to be infected.

■ ■ It must be admitted the showing as to the exact

number of cattle which were unhealthy leaves much to be desired. But we think there is a sufficient showing of something seriously wrong, whether anaplasmosis, or heavy worm infection, with many if not all of them, to permit a jury finding that there was a breach of the implied warranty of fitness. We have recognized that anything which delays the normal development of cattle to market condition is an element of damage. Breitenkamp v. Community Cooperative Association, supra, loc. cit. 253 Iowa 844, 114 N.W.2d 326.

As to the specific evidence of anaplasmosis, there is the testimony of Doctor Lynch that he had no question but what the cattle were so diseased. This diagnosis was made some months later; but in view of the evidence that the cattle were in poor condition and did not gain on ample feed and water, with several of the symptoms of anaplasmosis earlier undiagnosed, we think there was a jury question as to whether at least some of them were infected. The same is true of the worm condition, under Doctor Hasler's conclusion that in his judgment it must have existed before the cattle reached the plaintiffs.

The major question, of course, is not what specifically was wrong, but whether anything was wrong. There is ample evidence many of the cattle were not normal, healthy animals at anytime after being received by the plaintiffs. We do not hold that failure of animals to develop, to put on weight as the buyer might have expected, will in all cases support a claim of breach of warranty of fitness. But we think when this situation is supported by substantial evidence they were not healthy, that they were suffering from some malady which prevented their normal development, a jury question is engendered. We have said the evidence should be more definite as to the number actually affected. We do not overlook the fact that in some situations whether the failure of warranty was shown as to the entire herd, or flock, may be a jury question. Jaeger v. Hackert, 241 Iowa 379, 390, 41 N.W.2d 42, 48, 49. There it was shown that many young turkeys died of a highly infectious disease; and we said it was for the jury to say whether the death of others at about the same time was from the same malady. But

here we have a situation where the condition of all the cattle when received and during the months immediately following, as to failure to gain weight and their general appearance and actions could readily have been shown. For this reason, and for others set out in the following division, the case must be reversed.

III. Error is assigned upon the trial court's instruction on the measure of damages to be applied. Such error appears. The court, in its instruction No. 14, told the jury:

"In determining the amount of such damages they are entitled to recover the cost of the cattle to them, including the reasonable cost of necessary veterinarian services, feed, labor, hauling and other expenses, reduced, however, by any sums received by the counterclaimants for the sale of any or all such cattle at a subsequent time."

It will be observed this makes the measure of damages the amount paid for the cattle, plus the cost of necessary veterinary services, feed, labor, hauling, and other expenses, less amounts received from the sale of the cattle. In other words, the defendants are compelled to bear any drop in prices because of a lower market for cattle at the time of the sale. We know of no authority for such assessment of damages. The proper rule is set forth in section 554.70(7): "In the case of breach of warranty of quality, such loss, in the absence of special circumstances showing proximate damage of a greater amount, is the difference between the value of the goods at the time of delivery to the buyer and the value they would have had if they had answered to the warranty." This rule is not always applicable, under special circumstances. Drager v. Carlson Hybrid Corn Co., Inc., supra, loc. cit. 244 Iowa 86, 87, 56 N.W.2d 23. But we think the statute should be followed here. There are of course some special items which might properly be submitted here, if supported by competent evidence. In this category are veterinary services, and cost of feed and labor if it appears these were wasted because the cattle, through failure to meet the warranty of quality, were incapable of developing normally; that is to say, if they were expenses attributable to the breach of warranty. But this must be shown. Breiten-

kamp v. Community Cooperative Association, supra, loc. cit. 253 Iowa 844, 845, 114 N.W.2d 326; Jaeger v. Hackert, supra, 241 Iowa 379, 391,. 41 N.W.2d 42, 49. So we think the proper measure of damages to be applied here is that defined in section 554.70(7), supra, plus such special damages as may be properly proven.

The trial court, in its instruction No. 14, also went into involved figures as to the method of determining the measure of damages it submitted. Since we have held the measure of damages was improper, the figures were also in error. It also referred to a stipulation of the parties, which we find was not supported by the facts. All that appears in this regard is a statement by plaintiffs' counsel, but there is no showing of any acquiescence or agreement by the defendants. It should also be noted that the jury's determination, if it finds plaintiffs entitled to recover, should be the entire amount of their damages, leaving the judgment held by the Turners to be offset by the court after the trial.

IV. The defendants predicate error upon the court's failure to limit plaintiffs' recovery, if they were entitled to any, to more than nominal damages. We have held above that an improper measure of damages was submitted by the court. What the evidence may be on another trial we do not know. Consequently we do not decide the point stated above; nor do we make any finding on defendants' further contention that the damages allowed, if more than nominal were shown, were excessive.

The cause is reversed and remanded for further proceedings in accordance with this opinion.—Reversed and remanded.

All JUSTICES concur.