C & J FERTILIZER, INC., Appellant,

v.

ALLIED MUTUAL INSURANCE
COMPANY, Appellee.

No. 2–56355.

Supreme Court of Iowa.

March 19, 1975.

Rehearing Denied May 16, 1975.

Livingston, Day, Kehoe, Meeker & Bates, Washington, for appellant.

Bradshaw, Fowler, Proctor & Fairgrave, Des Moines, for appellee.

REYNOLDSON, Justice.

This action to recover for burglary loss under two separate insurance policies was tried to the court, resulting in a finding plaintiff had failed to establish a burglary within the policy definitions. Plaintiff appeals from judgment entered for defendant. We reverse and remand.

Trial court made certain findings of fact in support of its conclusion reached. Plaintiff operated a fertilizer plant in Olds, Iowa. At time of loss, plaintiff was insured under policies issued by defendant and titled "BROAD FORM STOREKEEPERS POLICY" and "MERCANTILE BURGLARY AND ROBBERY POLICY." Each policy defined "burglary" as meaning,

> " * * * the felonious abstraction of insured property (1) from within the premises by a person making felonious entry therein by actual force and violence, of which force and violence there are visible marks made by tools, explosives, electricity or chemicals upon, or physical damage to, the exterior of the premises at the place of such entry * * *."

On Saturday, April 18, 1970, all exterior doors to the building were locked when plaintiff's employees left the premises at the end of the business day. The following day, Sunday, April 19, 1970, one of plaintiff's employees was at the plant and found all doors locked and secure. On Monday, April 20, 1970, when the employees reported for work, the exterior doors were locked, but the front office door was unlocked.

There were truck tire tread marks visible in the mud in the driveway leading to and from the plexiglas door entrance to the warehouse. It was demonstrated this door could be forced open without leaving visible marks or physical damage.

There were no visible marks on the exterior of the building made by tools, explosives, electricity or chemicals, and there was no physical damage to the exterior of the building to evidence felonious entry into the building by force and violence.

Chemicals had been stored in an interior room of the warehouse. The door to this room, which had been locked, was physically damaged and carried visible marks made by tools. Chemicals had been taken at a net loss to plaintiff in the sum of $9,582. Office and shop equipment valued at $400.30 was also taken from the building.

Trial court held the policy definition of "burglary" was unambiguous, there was nothing in the record "upon which to base a finding that the door to plaintiff's place of business was entered feloniously, by actual force and violence," and, applying the policy language, found for defendant.

Certain other facts in the record were apparently deemed irrelevant by trial court because of its view the applicable law required it to enforce the policy provision. Because we conclude different rules of law apply, we also consider those facts.

The "BROAD FORM STOREKEEPERS POLICY" was issued April 14, 1969; the "MERCANTILE BURGLARY AND ROBBERY POLICY" on April 14, 1970. Those policies are in evidence. Prior policies apparently were first purchased in 1968. The agent, who had power to bind insurance coverage for defendant, was told plaintiff would be handling farm chemicals. After inspecting the building then used by plaintiff for storage he made certain suggestions regarding security. There ensued a conversation in which he pointed out there had to be visible evidence of burglary. There was no testimony by anyone that plaintiff was then or thereafter informed the policy to be delivered would define burglary to require "visible marks made by tools, explosives, electricity or chemicals upon, or physical damage to, the exterior of the premises at the place of * * * entry."

The import of this conversation with defendant's agent when the coverage was sold is best confirmed by the agent's complete and vocally-expressed surprise when defendant denied coverage. From what the agent saw (tire tracks and marks on the

interior of the building) and his contacts with the investigating officers " * * * the thought didn't enter my mind that it wasn't covered * * *." From the trial testimony it was obvious the only understanding was that there should be some hard evidence of a third-party burglary vis-a-vis an "inside job." The latter was in this instance effectively ruled out when the thief was required to break an interior door lock to gain access to the chemicals.

The agent testified the insurance was purchased and "the policy was sent out afterwards." The president of plaintiff corporation, a 37-year-old farmer with a high school education, looked at that portion of the policy setting out coverages, including coverage for burglary loss, the amounts of insurance, and the "location and description." He could not recall reading the fine print defining "burglary" on page three of the policy.

■ Trial court's "findings" must be examined in light of our applicable rules. Ordinarily in a law action tried to the court its findings of fact having adequate evidentiary support shall not be set aside unless induced by an erroneous view of the law. It follows, the rule does not preclude inquiry into the question whether, conceding the truth of a finding of fact, the trial court applied erroneous rules of law which materially affected the decision. Beneficial Finance Company of Waterloo v. Lamos, 179 N.W.2d 573, 578 (Iowa 1970) and citations.

■ Extrinsic evidence that throws light on the situation of the parties, the antecedent negotiations, the attendant circumstances and the objects they were thereby striving to attain is necessarily to be regarded as relevant to ascertain the actual significance and proper legal meaning of the agreement. Hamilton v. Wosepka, 261 Iowa 299, 306, 154 N.W.2d 164, 168 (1967); 3 Corbin on Contracts, 1971 pocket part § 543AA, pp. 91–95.

■ The question of *interpretation,* i. e., the meaning to be given contractual words, is one to be determined by the court unless the interpretation depends on extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence. See Restatement (Second) of Contracts § 238, p. 543 (Student Ed., Tent. Drafts Nos. 1–7, 1973). *Construction* of a contract means determination of its legal operation—its effect upon the action of the courts. Porter v. Iowa Power and Light Company, 217 N.W.2d 221, 228 (Iowa 1974); Boyer v. Iowa High School Athletic Association, 260 Iowa 1061, 1069, 152 N.W.2d 293, 298 (1967); 3 Corbin on Contracts § 534, pp. 7–9; 4 Williston on Contracts § 602, p. 320. "[C]onstruction [of a contract] is always a matter of law for the court." 3 Corbin on Contracts § 554, p. 227. "[C]ourts in construing and applying a standardized contract seek to effectuate the reasonable expectations of the average member of the public who accepts it." Restatement (Second) of Contracts, supra, § 237, comment *e,* p. 540.

Trial court in the case *sub judice,* concentrating on the policy "definition" of burglary, limited its consideration of the facts to the issue whether there was evidence which satisfied that provision. Thus we find the language " * * * There was no physical damage to the exterior of the building to evidence felonious entry to the building *by force and violence;* " "There is nothing in the record upon which to base a finding that the door to plaintiff's place of business was entered feloniously, *by actual force and violence;* " "The evidence in this case is just as consistent with a theory that an employee entered the building with a key as it is to a theory that the building was entered *by force and violence.*" (Emphasis supplied.).

Trial court never made a finding there was or was not a burglary. We have noted its examination of the evidence was tailored to fit the policy "definition" of burglary: " 'Burglary' means the felonious abstraction of insured property (1) from within the premises by a person making *felonious entry therein by actual force and violence,* of

which force and violence there are visible marks * * * ." (Emphasis supplied.).

Nor did trial court consider the evidence in light of the layman's concept of burglary (who might well consider a stealing intruder in his home or business premises as a burglar, whether or not the door was entered by force and violence) or the legal definition of burglary, hereinafter referred to. Trial court made no determination regarding burglary in those contexts.

▮▮ Insofar as trial court was construing the policy—that being a matter of law for the court—we are not bound by its conclusions. See Farmers Insurance Group v. Merryweather, 214 N.W.2d 184, 187 (Iowa 1974); E. Patterson, The Interpretation and Construction of Contracts, 64 Colum.L.Rev. 833, 836–37 (1964). Neither are we bound by trial court's rule this case is controlled by the fineprint "definition" of burglary, if that rule was erroneously applied below. Beneficial Finance Company of Waterloo v. Lamos, supra.

Trial court did find "[T]here does not appear to have been a discussion of the policy provisions between the parties at the time the policy was secured * * * ." That finding is well supported: there is no evidence plaintiff knew of the definition of burglary contained in the policy until after the event. But both parties agree there was conversation concerning the type of insurance and the property to be insured. While plaintiff's president's testimony is ambivalent as to whether it occurred before or after the predecessor policies were issued, the defendant's agent was clear the conversation occurred before any policies were delivered.

There is nothing about trial court's factual findings which precludes this court from construing said contract to arrive at a proper determination of its legal operation as between these parties, or from considering whether the decision appealed from resulted from the application of an erroneous rule of law. And if the definition of "burglary" in defendant's policy is not enforceable here, then trial court's finding there was no evidence of forcible entry through an outside door is not controlling in the disposition of this case.

Plaintiff's theories of recovery based on "reasonable expectations," implied warranty and unconscionability must be viewed in light of accelerating change in the field of contracts.

I. *Revolution in formation of contractual relationships.*

Many of our principles for resolving conflicts relating to written contracts were formulated at an early time when parties of equal strength negotiated in the historical sequence of offer, acceptance, and reduction to writing. The concept that both parties assented to the resulting document had solid footing in fact.

Only recently has the sweeping change in the inception of the document received widespread recognition:

"Standard form contracts probably account for more than ninety-nine percent of all contracts now made. Most persons have difficulty remembering the last time they contracted other than by standard form; except for casual oral agreements, they probably never have. But if they are active, they contract by standard form several times a day. Parking lot and theater tickets, package receipts, department store charge slips, and gas station credit card purchase slips are all standard form contracts.

"* * *

"* * * The contracting still imagined by courts and law teachers as typical, in which both parties participate in choosing the language of their entire agreement, is no longer of much more than historical importance."

—W. Slawson, Standard Form Contracts and Democratic Control of Lawmaking Power, 84 Harv.L.Rev. 529 (1971).

With respect to those interested in buying insurance, it has been observed that:

"His chances of successfully negotiating with the company for any substantial change in the proposed contract are just about zero. The insurance company tenders the insurance upon a 'take it or leave it' basis.

" * * *

" ' * * * Few persons solicited to take policies understand the subject of insurance or the rules of law governing the negotiations, and they have no voice in dictating the terms of what is called the contract. They are clear upon two or three points which the agent promises to protect, and for everything else they must sign ready-made applications and accept ready-made policies carefully concocted to conserve the interests of the company. * * * The subject, therefore, is *sui generis,* and the rules of a legal system devised to govern the formation of ordinary contracts between man and man cannot be mechanically applied to it.' "

—7 Williston on Contracts § 900, pp. 29–30 (3d Ed. 1963).

See also 3 Corbin on Contracts § 559, p. 266 (1960); 6A Corbin on Contracts § 1376, p. 21; Grismore on Contracts § 294, pp. 505–507 (Rev.Ed. J. E. Murray, Jr. 1965); R. Keeton, Insurance Law Rights At Variance With Policy Provisions, 83 Harv.L.Rev. 961, 966–67 (1970); F. Kessler, Contracts of Adhesion—Some Thoughts About Freedom of Contract, 43 Colum.L.Rev. 629 (1943); C. Oldfather, Toward a Usable Method of Judicial Review of the Adhesion Contractor's Lawmaking, 16 Kansas L.Rev. 303 (1968).

It is generally recognized the insured will not read the detailed, cross-referenced, standardized, mass-produced insurance form, nor understand it if he does. 7 Williston on Contracts § 906B, p. 300 ("But where the document thus delivered to him is a contract of insurance the majority rule is that the insured is not bound to know its contents"); 3 Corbin on Contracts § 559, pp. 265–66 ("One who applies for an insurance policy * * * may not even read the policy, the number of its terms and the fineness of its print being such as to discourage him"); Note, Unconscionable Contracts: The Uniform Commercial Code, 45 Iowa L.Rev. 843, 844 (1960) ("It is probably a safe assertion that most involved standardized form contracts are never read by the party who 'adheres' to them. In such situations, the proponent of the form is free to dictate terms most advantageous to himself"); see Hully v. Aluminum Company of America, 143 F.Supp. 508, 513 (S.D.Iowa 1956), aff'd sub nom. Columbia Casualty Company v. Eichleay Corporation, 245 F.2d 1 (8 Cir. 1957); Collegiate Mfg. Co. v. McDowell's Agency, Inc., 200 N.W.2d 854, 859 (Iowa 1972); Quinn v. Mutual Benefit Health & Acc. Ass'n of Omaha, 244 Iowa 6, 14, 55 N.W.2d 546, 550 (1952); Lankhorst v. Union Fire Ins. Co., 236 Iowa 838, 844, 20 N.W.2d 14, 17 (1945).

The concept that persons must obey public laws enacted by their own representatives does not offend a fundamental sense of justice: an inherent element of assent pervades the process.

■ But the inevitable result of enforcing all provisions of the adhesion contract, frequently, as here, delivered subsequent to the transaction and containing provisions never assented to, would be an abdication of judicial responsibility in face of basic unfairness and a recognition that persons' rights shall be controlled by private lawmakers without the consent, express or implied, of those affected. See Grismore, supra § 294 at p. 506; K. Llewellyn, What Price Contract?—An Essay in Perspective, 40 Yale L.J. 704, 731 (1931); Meyer, Contracts of Adhesion and The Doctrine of Fundamental Breach, 50 Va.L.Rev. 1178, 1179 (1964); C. Oldfather, supra at 303–04. A question is also raised whether a court may constitutionally allow that power to exist in private hands except where appropriate safeguards are present, including a right to meaningful judicial review. See W. Slawson, supra at 553.

The statutory requirement that the form of policies be approved by the commissioner of insurance, § 515.109, The Code, neither resolves the issue whether the fine-print provisions nullify the insurance bargained for in a given case nor ousts the court from necessary jurisdiction. See, e. g., Benzer v. Iowa Mutual Tornado Insurance Ass'n, 216 N.W.2d 385 (Iowa 1974); Union Ins. Co. (Mutual) v. Iowa Hardware Mut. Ins. Co., 175 N.W.2d 413 (1970). In this connection it has been pertinently stated:

> "Insurance contracts continue to be contracts of adhesion, under which the insured is left little choice beyond electing among standardized provisions offered to him, even when the standard forms are prescribed by public officials rather than insurers. Moreover, although statutory and administrative regulations have made increasing inroads on the insurer's autonomy by prescribing some kinds of provisions and proscribing others, most insurance policy provisions are still drafted by insurers. Regulation is relatively weak in most instances, and even the provisions prescribed or approved by legislative or administrative action ordinarily are in essence adoptions, outright or slightly modified, of proposals made by insurers' draftsmen.

> "Under such circumstances as these, judicial regulation of contracts of adhesion, whether concerning insurance or some other kind of transaction, remains appropriate."

—R. Keeton, supra at 966–67.

See also 3 Corbin on Contracts § 559, p. 267.

The mass-produced boiler-plate "contracts," necessitated and spawned by the explosive growth of complex business transactions in a burgeoning population left courts frequently frustrated in attempting to arrive at just results by applying many of the traditional contract-construing stratagems. As long as fifteen years ago Professor Llewellyn, reflecting on this situation in his book "The Common Law Tradition—Deciding Appeals," pp. 362–71 wrote,

> "What the story shows thus far is first, scholars persistently off-base while judges grope over well-nigh a century in irregular but dogged fashion for escape from a recurring discomfort of imbalance that rests on what is in fact substantial *nonagreement* despite perfect semblance of agreement. (pp. 367–368).

> " * * *

> "The answer, I suggest, is this: Instead of thinking about 'assent' to boiler-plate clauses, we can recognize that so far as concerns the specific, there is no assent at all. What has in fact been assented to, specifically, are the few dickered terms, and the broad type of transaction, and but one thing more. That one thing more is a blanket assent (not a specific assent) to any not unreasonable or indecent terms the seller may have on his form, which do not alter or eviscerate the reasonable meaning of the dickered terms. The fine print which has not been read has no business to cut under the reasonable meaning of those dickered terms which constitute the dominant and only real expression of agreement, but much of it commonly belongs in." (p. 370)

In fairness to the often-discerned ability of the common law to develop solutions for changing demands, it should be noted appellate courts take cases as they come, constrained by issues the litigants formulated in trial court—a point not infrequently overlooked by academicians. Nor can a lawyer in the ordinary case be faulted for not risking a client's cause on an uncharted course when there is a reasonable prospect of reaching a fair result through familiar channels of long-accepted legal principles, for example, those grounded on ambiguity in language, the duty to define limitations or exclusions in clear and explicit terms, and interpretation of language from the viewpoint of an ordinary person, not a specialist or expert. See Benzer v. Iowa Mutual Tornado Insurance Ass'n, supra at 388.

Plaintiff's claim it should be granted relief under the legal doctrines of reasonable expectations, implied warranty and unconscionability should be viewed against the above backdrop.

## II. *Reasonable expectations.*

■ This court adopted the doctrine of reasonable expectations in Rodman v. State Farm Mutual Ins. Co., 208 N.W.2d 903, 905–908 (Iowa 1973). The *Rodman* court approved the following articulation of that concept:

> " 'The objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations.' "
>
> —208 N.W.2d at 906.

See Gray v. Zurich Insurance Company, 65 Cal.2d 263, 54 Cal.Rptr. 104, 107–108, 419 P.2d 168, 171–172 (1966); Allen v. Metropolitan Life Ins. Co., 44 N.J. 294, 305, 208 A.2d 638, 644 (1965); Restatement (Second) of Contracts, supra, § 237, comments *e* and *f*, pp. 540–41; 1 Corbin on Contracts § 1, p. 2 ("That portion of the field of law that is classified and described as the law of contracts attempts the realization of reasonable expectations that have been induced by the making of a promise"); 7 Williston on Contracts § 900, pp. 33–34 ("Some courts, recognizing that very few insureds even try to read and understand the policy or application, have declared that the insured is justified in assuming that the policy which is delivered to him has been faithfully prepared by the company to provide the protection against the risk which he had asked for. * * * Obviously this judicial attitude is a far cry from the old motto 'caveat emptor.' ").

At comment *f* to § 237 of Restatement (Second) of Contracts, supra pp. 540–41, we find the following analysis of the reasonable expectations doctrine:

> "Although customers typically adhere to standardized agreements and are bound by them without even appearing to know the standard terms in detail, they are not bound to unknown terms which are beyond the range of reasonable expectation. A debtor who delivers a check to his creditor with the amount blank does not authorize the insertion of an infinite figure. Similarly, a party who adheres to the other party's standard terms does not assent to a term if the other party has reason to believe that the adhering party would not have accepted the agreement if he had known that the agreement contained the particular term. Such a belief or assumption may be shown by the prior negotiations or inferred from the circumstances. Reason to believe may be inferred from the fact that the term is bizarre or oppressive, from the fact that it eviscerates the non-standard terms explicitly agreed to, or from the fact that it eliminates the dominant purpose of the transaction. The inference is reinforced if the adhering party never had an opportunity to read the term, or if it is illegible or otherwise hidden from view. This rule is closely related to the policy against unconscionable terms and the rule of interpretation against the draftsman."

Nor can it be asserted the above doctrine does not apply here because plaintiff knew the policy contained the provision now complained of and cannot be heard to say it reasonably expected what it knew was not there. A search of the record discloses no such knowledge.

The evidence does show, as above noted, a "dicker" for burglary insurance coverage on chemicals and equipment. The negotiation was for what was actually expressed in the policies' "Insuring Agreements": the insurer's promise "To pay for loss by burglary or by robbery of a watchman, while the premises are not open for business, of merchandise, furniture, fixtures and equipment within the premises * * *."

In addition, the conversation included statements from which the plaintiff should have understood defendant's obligation to

pay would not arise where the burglary was an "inside job." Thus the following exclusion should have been reasonably anticipated:

*"Exclusions*

"This policy does not apply:

" * * *

"(b) to loss due to any fraudulent, dishonest or criminal act by any Insured, a partner therein, or an officer, employee, director, trustee or authorized representative thereof * * *."

But there was nothing relating to the negotiations with defendant's agent which would have led plaintiff to reasonably anticipate defendant would bury within the definition of "burglary" another exclusion denying coverage when, no matter how extensive the proof of a third-party burglary, no marks were left on the exterior of the premises. This escape clause, here triggered by the burglar's talent (an investigating law officer, apparently acquainted with the current modus operandi, gained access to the steel building without leaving any marks by leaning on the overhead plexiglas door while simultaneously turning the locked handle), was never read to or by plaintiff's personnel, nor was the substance explained by defendant's agent.

Moreover, the burglary "definition" which crept into this policy comports neither with the concept a layman might have of that crime, nor with a legal interpretation. See State v. Murray, 222 Iowa 925, 931, 270 N.W. 355, 358 (1936) ("We have held that even though the door was partially open, by opening it farther, in order to enter the building, this is a sufficient breaking to comply with the demands of the statute"); State v. Ferguson, 149 Iowa 476, 478–479, 128 N.W. 840, 841–842 (1910) ("It need not appear that this office was an independent building, for it is well known that it is burglary for one to break and enter an *inner door or window*, although the culprit entered through an open outer

door * * * "); see State v. Hougland, 197 N.W.2d 364, 365 (Iowa 1972).

The most plaintiff might have reasonably anticipated was a policy requirement of visual evidence (abundant here) indicating the burglary was an "outside" not an "inside" job. The exclusion in issue, masking as a definition, makes insurer's obligation to pay turn on the skill of the burglar, not on the event the parties bargained for: a bonafide third party burglary resulting in loss of plaintiff's chemicals and equipment.

The "reasonable expectations" attention to the basic agreement, to the concept of substance over form, was appropriately applied by this court for the insurer's benefit in Central Bearings Co. v. Wolverine Insurance Company, 179 N.W.2d 443 (Iowa 1970), a case antedating *Rodman*. We there reversed a judgment for the insured which trial court apparently grounded on a claimed ambiguity in the policy. In denying coverage on what was essentially a products liability claim where the insured purchased only a "Premises-Operations" policy (without any misrepresentation, misunderstanding or overreaching) we said at page 449 of 179 N.W.2d:

"In summation we think the insured as a reasonable person would understand the policy coverage purchased meant the insured was not covered for loss if the 'accident' with concomitant damage to a victim occurred away from the premises and after the operation or sale was complete."

The same rationale of reasonable expectations should be applied when it would operate to the advantage of the insured. Appropriately applied to this case, the doctrine demands reversal and judgment for plaintiff.

### III. *Implied warranty.*

■ Plaintiff should also prevail because defendant breached an implied warranty that the policy later delivered would be *reasonably fit for its intended purpose:* to set out in writing the obligations of the

parties (1) without altering or impairing the fair meaning of the protection bargained for when read alone, and (2) in terms that are neither in the particular nor in the net manifestly unreasonable and unfair. See K. Llewellyn, The Common Law Tradition—*Deciding Appeals,* p. 371.

More than 75 years ago this court, without statutory support, recognized in contracts for sale of tangible property there was a warranty implied by law that the goods sold "were reasonably fit for the purpose for which they were intended." Alpha Check-Rower Co. v. Bradley, 105 Iowa 537, 547, 75 N.W. 369, 372 (1898). This seminal concept of basic fairness grew by progressive court decisions and statutory enactments into that network of protection which today guards the chattel purchaser from exploitation. See, e. g., Hughes v. National Equipment Corporation, 216 Iowa 1000, 250 N.W. 154 (1933) (statement in written sales contract that it contained the entire agreement did not exclude implied warranty); State Farm Mut. Auto. Ins. Co. v. Anderson-Weber, Inc., 252 Iowa 1289, 110 N.W.2d 449 (1961) (privity of contract defense to breach of warranty repudiated; terms and limitations of fine-print express warranty do not relieve manufacturer or seller from implied warranty obligations); Turner v. Kunde, 256 Iowa 835, 128 N.W.2d 196 (1964) (voiding disclaimer of implied warranty in sales memorandum delivered to buyer *after* the bargain was made); Dailey v. Holiday Distributing Corporation, 260 Iowa 859, 151 N.W.2d 477 (1967) (fine-print conditions on back of purchase order not brought to buyer's attention no defense to claim of implied warranty); § 554.1102(3), The Code (" * * * the obligations of good faith, diligence, reasonableness and care prescribed by this chapter may not be disclaimed * * * "); § 554.1201(10) (" * * * Language in the body of a form is 'conspicuous' if it is in larger or other contrasting type or color * * * "); § 554.1203 ("Every contract or duty * * imposes an obligation of good faith in its performance or enforcement"); § 554.2302

(effect of unconscionable contract clauses may be avoided by the court); § 554.2313 (express warranties); §§ 554.2314, 554.2315 (implied warranties); § 554.2316 (writing to exclude implied warranties of merchantability and fitness must be "conspicuous").

"The final and perhaps most significant characteristic of insurance contracts differentiating them from ordinary, negotiated commercial contract, is the increasing tendency of the public to look upon the insurance policy not as a contract but as a special form of chattel. The typical applicant buys 'protection' much as he buys groceries."

—7 Williston on Contracts § 900, p. 34.

We would be derelict in our duty to administer justice if we were not to judicially know that modern insurance companies have turned to mass advertising to sell "protection." A person who has been incessantly assured a given company's policies will afford him complete protection is unlikely to be wary enough to search his policy to find a provision nullifying his burglary protection if the burglar breaks open an inside, but not an outside, door.

There is little justification in depriving purchasers of merchandized "protection" of those remedies long available to purchasers of goods:

"Although implied warranties of fitness for intended purpose have traditionally been attached only to sales of tangible products, there is no reason why they should not be attached to 'sales of promises' as well. Whether a product is tangible or intangible, its creator ordinarily has reason to know of the purposes for which the buyer intends to use it, and buyers ordinarily rely on the creator's skill or judgment in furnishing it. The reasonable consumer for example depends on an insurance agent and insurance company to sell him a policy that 'works' for its intended purpose in much the same way that he depends on a television salesman and television manufacturer. In neither case is he likely to be

competent to judge the fitness of the product himself; in both, he must rely on common knowledge and the creator's advertising and promotion."

—W. Slawson, supra at 546–47.

See also K. Llewellyn, "The Common Law Tradition—Deciding Appeals," p. 370–71.

■ Effective imposition of an implied warranty would encourage insurers to make known to insurance buyers those provisions which would limit the implied warranty inherent in the situation. These exclusions would then become part of the initial bargaining. Such provisions, mandated by the Uniform Commercial Code to be "conspicuous" in the sale of goods (§ 554.2316, The Code), should be conspicuously presented by the insurer in the sale of protection. This would be no more difficult than the manner in which they advertise their product's desirable features. See Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 400, 161 A.2d 69, 93 (1960). From a public policy viewpoint, such a requirement (in order to enforce what is essentially an exclusion) might promote meaningful competition among insurers in eliminating technical policy provisions which drain away bargained-for protection. The ultimate benefit would be a chance for knowledgeable selection by insurance purchasers among various coverages.

Recognition of an implied warranty is a small step, if indeed it is any, beyond a concept this court has long articulated in the policy reformation cases. Norem v. Iowa Implement Mut. Ins. Ass'n, 196 Iowa 983, 988, 195 N.W. 725, 727 (1923) ("The insured may generally, at least in taking out insurance, rely upon the company to issue a policy payable to the proper person *and in a form to carry out its purpose.*" [Emphasis supplied]); Smith v. National Fire Ins. Co., 201 Iowa 363, 367, 207 N.W. 334, 335 (1926) ("The plaintiff was not negligent in not reading the policy").

Ten years ago this court banished the ancient doctrine of caveat emptor as the polestar for business. Syester v. Banta, 257 Iowa 613, 616, 133 N.W.2d 666, 668 (1965). In Mease v. Fox, 200 N.W.2d 791 (Iowa 1972) we joined a scant handful of courts pioneering the concept that implied warranty relief was not the captive of chattel sales law, but was available to resolve long-standing inequities in the law of dwelling leases. It is now time to provide buyers of protection the same safeguards provided for buyers of personalty and lessees of dwellings.

The policy provided by defendant in this instance breached the implied warranty of fitness for its intended purpose. It altered and impaired the fair meaning of the bargain these parties made for plaintiff's insurance protection. This law theory further requires reversal of trial court's decision.

IV. *Unconscionability.*

■ Plaintiff is also entitled to a reversal because the liability-avoiding provision in the definition of the burglary is, in the circumstances of this case, unconscionable.

We have already noted the policies were not even before the negotiating persons when the protection was purchased. The fair inference to be drawn from the testimony is that the understanding contemplated only visual evidence of bona-fide burglary to eliminate the risk of an "inside job."

The policies in question contain a classic example of that proverbial fine print (six point type as compared with the twenty-four point type appearing on the face of the policies: "BROAD FORM STOREKEEPERS POLICY" and "MERCANTILE BURGLARY AND ROBBERY POLICY") which "becomes visible only after the event." Such print is additionally suspect when, instead of appearing logically in the "exclusions" of the policies, it poses as a part of an esoteric definition of burglary. A similar contract containing a vast volume of printed conditions neither mentioned nor discussed between the parties once elicited the following comment from this court,

"It is enough at this time to say that, if it be a contract it is like the Apostle's conception of the human frame, 'fearfully and wonderfully made,' and one upon the construction and effect of which a competent and experienced lawyer may spend days of careful study, without exhausting its possibilities."

—New Prague Flouring Mill Co. v. Spears, 194 Iowa 417, 438–39, 189 N.W. 815, 824 (1922).

The situation before us plainly justifies application of the unconscionability doctrine:

"Standardized contracts such as insurance policies, drafted by powerful commercial units and put before individuals on the 'accept this or get nothing' basis, are carefully scrutinized by the courts for the purpose of avoiding enforcement of 'unconscionable' clauses."

—6A Corbin on Contracts § 1376, p. 21.

The rule of selective elimination of unconscionable provisions is articulated in the tentative draft of the Restatement (Second) of Contracts, supra § 234, p. 528:

"§ 234. Unconscionable Contract or Term

"If a contract or term thereof is unconscionable at the time the contract is made a court may refuse to enforce the contract, or may enforce the remainder of the contract without the unconscionable term, or may so limit the application of any unconscionable term as to avoid any unconscionable result."

The following statement appears in comment *"a. Scope*:

"Particularly in the case of standardized agreements, the rule of this Section permits the court to pass directly on the unconscionability of the contract or clause rather than to avoid unconscionable results by interpretation."

Comment *"d. Weakness in the bargaining process"* incorporates the following observation,

"[G]ross inequality of bargaining power, together with terms unreasonably favorable to the stronger party, may confirm indications that the transaction involved elements of deception or compulsion, or may show that the weaker party had no meaningful choice, no real alternative, or did not in fact assent or appear to assent to the unfair terms."

The resources of a court to avoid unconscionable provisions are not exhausted after a determination of inapplicability of the *contra proferentum* rule: "Even in such a case, the court may refuse to enforce an unconscionable provision and may give such remedy as justice requires * * *. A contractor may defeat his own ends by the use of complex printed forms devised with intent to get the most and to give the least." 3 Corbin on Contracts § 559, pp. 270–71. See Campbell Soup Co. v. Wentz, 172 F.2d 80 (3 Cir. 1948); Henningsen v. Bloomfield Motors, Inc., supra; § 554.2302, The Code.

The following reference to the *Henningsen* court and to the unconscionability relief in the commercial code (§ 554.2302, The Code) appears in Grismore, supra, § 294, pp. 508–509:

"After an extensive discussion of some of the cases, the court took the forthright position that the attempted disclaimer in the instant case was 'so inimical to the public good as to compel an adjudication of its invalidity.' This court said what it meant instead of interpreting or constructing its way to the just result. This frontier decision may help to guide other courts to add to the development of a doctrine of unconscionability which will gain the necessary certainty by the traditional process of case-by-case adjudication.

"Adding to the probability that unconscionability will be the stated basis for refusing to enforce oppressive contracts or provisions in the future is the Uniform Commercial Code provision which permits courts to police contracts on this basis.

* * * [T]he section is an express recognition of the basic principle. Though the Code is technically applicable only to contracts for the sale of goods, its influence cannot help but be felt in other types of transactions so that most of our courts can say what they mean in refusing to enforce harsh contracts or provisions. Those who would obstruct the development of the unconscionability concept on grounds of uncertainty, indefiniteness and judicial lawmaking, must be characterized as misunderstanding the dynamic nature of the common law and statutory interpretation."

The Iowa court quoted extensively from *Henningsen* and adopted its sound reasoning in State Farm Mut. Auto. Ins. Co. v. Anderson-Weber, Inc., supra.

A policy of relying solely on traditional techniques of construction in an effort to avoid the effect of unconscionable provisions ultimately compounds the problem:

"First, since they [such techniques] all rest on the admission that the clauses in question are permissible in purpose and content, they invite the draftsman to recur to the attack. Give him time, and he will make the grade. Second, since they do not face the issue, they fail to accumulate either experience or authority in the needed direction: that of making out for any given type of transaction what the *minimum decencies* are which a court will insist upon as essential to an enforceable bargain of a given type, or as being inherent in a bargain of that type. Third, since they purport to construe, and do not really construe, nor are intended to * * * they seriously embarrass later efforts * * * to get at the true meaning of those wholly legitimate contracts and clauses which call for their meaning to be got at instead of avoided."
—Llewellyn, Book Review, 52 Harv.L. Rev. 700, 703 (1939).

See Note, supra, 45 Iowa L.Rev. at 845–46 (1960). In the same vein, see 3 Corbin on Contracts § 561, p. 279:

"[A] better brand of justice may be delivered by a court that is clearly conscious of its own processes, than by one that states hard-bitten traditional rules and doctrines and then attains an instinctively felt justice by an avoidance of them that is only half-conscious, accompanied by an extended exegesis worthy of a medieval theologian."

It should be observed that even less justice is attained where, as here, trial court simply stopped with the hard-bitten rules.

 Commentators suggest a court considering a claim of unconscionability should examine the factors of assent, unfair surprise, notice, disparity of bargaining power and substantive unfairness. W. Slawson, supra at 564, and citations, n. 79. We have already touched on those considerations in the factual discussions, above. In addition, it would seem appropriate, in every trial when the unconscionability of a contractual provision is a viable issue, to permit either party the right granted by § 554.2302(2), The Code:

"When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination."

In the case *sub judice*, plaintiff's evidence demonstrated the definitional provision was unconscionable. Defendant never offered any evidence, let alone evidence which might support a conclusion the provision in issue, considered in its commercial setting, was either a reasonable limitation on the protection it offered or should have been reasonably anticipated by plaintiff.

Trial court's decision must be reversed because the above provision is unconscionable in view of all the circumstances, including the initial negotiations of these parties.

We reverse and remand for judgment in conformance herewith.

Reversed and remanded.

HARRIS and McCORMICK, JJ., concur.

MASON and RAWLINGS, JJ., concur in Divisions I, II and IV and the result.

LeGRAND, J., MOORE, C. J., and REES and UHLENHOPP, JJ., dissent.

LeGRAND, Justice (dissenting).

I dissent from the result reached by the majority because it ignores virtually every rule by which we have heretofore adjudicated such cases and affords plaintiff ex post facto insurance coverage which it not only did not buy but which it *knew* it did not buy.

The majority revokes, at least for this case, the principle that in law cases tried to the court the findings are binding on us if supported by substantial evidence and that we view the evidence in its most favorable light to *sustain* rather than *defeat* those findings. Long v. Glidden Mutual Insurance Association, 215 N.W.2d 271, 272 (Iowa 1974). It does so by characterizing them as erroneously applied conclusions of law rather than findings of fact, although I find this clearly contrary to prior authority. Brammer v. Allied Mutual Insurance Company, 182 N.W.2d 169, 172, 173 (Iowa 1970); Iowa-Des Moines National Bank v. Insurance Company of North America, (8th Cir. 1972), 459 F.2d 650, 653, 654; see also Rule 344(f)(1, 14, 17), Rules of Civil Procedure.

The result reached directly contravenes our previous decisions, particularly Long v. Glidden, supra, where we felt bound to honor the trial court's findings that a loss had been shown under a theft policy. This court was divided 5 to 3 on that issue, with the dissenters arguing there was a total lack of evidence to support the trial court.

I concurred in the *Long* case for the same reason I dissent here. I could not say there, and I cannot say now, the trial court's findings lacked substantial support on the disputed facts in either case.

It is interesting to note in *Long* our decision was bottomed on the failure of the policy to define "theft" and we therefore felt justified in giving it the "general and broad connotation" it usually has. In the present case "burglary" is clearly and unambiguously defined; but now the majority complains because it's in the wrong place and in the wrong size type—this despite the universal rule of construction that a policy of insurance must be read and construed in its entirety. Hoefler v. Farm & City Insurance Company, 193 N.W.2d 538, 540 (Iowa 1972); Stover v. State Farm Mutual Insurance Company, 189 N.W.2d 588, 591 (Iowa 1971); Iowa-Des Moines National Bank v. Insurance Company of North America, supra, 459 F.2d at 650; Mallinger v. State Farm Mutual Auto Insurance Company, 253 Iowa 222, 226, 111 N.W.2d 647, 651 (1961); Lichtentag v. Millers National Fire Insurance Company of Texas, 250 So.2d 105, 107 (C.A.La.1971).

While it may be very well to talk in grand terms about "mass advertising" by insurance companies and "incessant" assurances as to coverage which mislead the "unwary," particularly about "fine-print" provisions, such discussion should somehow be related to the case under review. Our primary duty, after all, is to resolve *this* dispute for *these* litigants under *this* record.

There is total silence in this case concerning any of the practices the majority finds offensive; nor is there any claim plaintiff was beguiled by such conduct into believing it had more protection than it actually did.

The record is even stronger against the majority's fine-print argument, the stereotype accusation which serves as a coup de grâce in all insurance cases. Except for larger type on the face sheet and black (but not larger) print to designate divisions and sub-headings, the entire policies are of one size and style of print. To compare the *face* sheet with the body of the policy is like comparing a book's jacket cover with the narrative content; and the use of black type or other means of emphasis to separate one part of an instrument from another is

an approved editorial expedient which serves to *assist*, not *hinder*, readability. In fact many of our opinions, including that of the majority in the instant case, resort to that device.

Tested by any objective standard, the size and style of type used cannot be fairly described as "fine print." The majority's description, right or wrong, of the plight of consumers generally should not be the basis for resolving the case now before us.

Like all other appeals, this one should be decided on what the record discloses—a fact which the majority concedes but promptly disregards.

Crucial to a correct determination of this appeal is the disputed provision of each policy defining burglary as "the felonious abstraction of insured property * * * by a person making felonious entry * * by actual force and violence, of which force and violence there are visible marks made by tools, explosives, electricity or chemicals upon, or physical damage to, the exterior of the premises at the place of such entry * * *." The starting point of any consideration of that definition is a determination whether it is ambiguous. Yet the majority does not even mention ambiguity.

The purpose of such a provision, of course, is to omit from coverage "inside jobs" or those resulting from fraud or complicity by the assured. The overwhelming weight of authority upholds such provisions as legitimate in purpose and unambiguous in application. Annot. 99 A.L.R.2d 129, 134 (1965); 44 Am.Jur.2d Insurance § 1400, § 1401 (1969); 10 Couch Cyclopedia of Insurance Law (2d Ed.) 42:128–42:130 (1962); 5 Appleman Insurance Law and Practice § 3176, § 3177; Lichtentag v. Millers Mutual Fire Insurance Company, 250 So.2d 105, 107 (C.A.La.1971); Johnson v. Pacific Indemnity Company, (1966), 242 Cal.App.2d 878, 52 Cal.Rptr. 76, 79; Offutt v. Liberty Mutual Insurance Company, 251 Md. 262, 247 A.2d 272, 276 (1968); Hazuka v. Maryland Casualty Company, 183 Neb. 336, 160 N.W.2d 174, 178 (1968); Swanson, Inc. v.

Central Surety & Insurance Corporation, 343 Mo. 350, 121 S.W.2d 783, 786 (1938); Blank v. National Surety Company, 181 Iowa 648, 650, 651, 165 N.W. 46, 47 (1917).

Once this indisputable fact is recognized, plaintiff's arguments virtually collapse. We may not—at least we *should* not—by any accepted standard of construction meddle with contracts which clearly and plainly state their meaning simply because we dislike that meaning, even in the case of insurance policies. Stover v. State Farm Mutual Insurance Corporation, 189 N.W.2d 588, 591 (Iowa 1971); Hein v. American Family Mutual Insurance Company, 166 N.W.2d 363, 366 (Iowa 1969); Mallinger v. State Farm Mutual Insurance Company, 253 Iowa 222, 226, 111 N.W.2d 647, 651 (1961); Wenthe v. Hospital Service, Inc., 251 Iowa 765, 768, 100 N.W.2d 903, 905 (1960); Hiatt v. Travelers Insurance Company, 197 Iowa 153, 156, 197 N.W. 3, 4, 33 A.L.R. 655 (1924).

Nor can the doctrine of reasonable expectations be applied here. We adopted that rule in Rodman v. State Farm Mutual Automobile Insurance Company, 208 N.W.2d 903, 906, 907 (Iowa 1973). We refused, however to apply it in that case, where we said:

"The real question here is whether the principle of reasonable expectations should be extended to cases where an ordinary layman would not misunderstand his coverage from a reading of the policy and where there are no circumstances attributable to the insurer which foster coverage expectations. Plaintiff does not contend he misunderstood the policy. He did not read it. He now asserts in retrospect that if he had read it he would not have understood it. He does not say he was misled by conduct or representations of the insurer. He simply asked trial court to rewrite the policy to cover his loss because if he had purchased his automobile insurance from another company the loss would have been covered, he did not know it was not covered, and if he had known it was not

covered he would have purchased a different policy. Trial court declined to do so. We believe trial court correctly refused in these circumstances to extend the principle of reasonable expectations to impose liability."

Yet here the majority would extend the doctrine far beyond the point of refusal in *Rodman*. Here we have affirmative and unequivocal testimony from an officer and director of the plaintiff corporation that he knew the disputed provision was in the policies because "it was just like the insurance policy I have on my farm."

I cannot agree plaintiff may now assert it reasonably expected from these policies something it knew was not there.

These same observations should dispose of plaintiff's claim of implied warranty, a theory incidentally for which there is no case authority at all. The majority apparently seeks to bring insurance contracts within the ambit of the Uniform Commercial Code governing sales of *goods*. I believe the definitional section of the Code itself precludes that notion. See § 554.2105, The Code. This *should* put an end to the majority's argument that buying insurance protection is the same as buying groceries. The complete absence of support from other jurisdictions would also suggest it is indefensible. At least it has done so to some courts. See Drabbels v. Skelly Oil Company, 155 Neb. 17, 50 N.W.2d 229, 231 (Neb. 1951).

The remaining ground upon which the majority invalidates the policies—unconscionability—has also been disavowed by the great majority of courts which have decided the question, usually in connection with public policy considerations. See Scanlon v. Western Fire Insurance Company, 4 Mich.App. 234, 144 N.W.2d 677, 679 (1966); Artess v. State Farm Fire & Casualty Company, 429 S.W.2d 430, 433 (Tenn. 1968); Limberis v. Aetna Casualty & Surety Company, 263 A.2d 83, 86 (Maine 1970); Abrams v. National Fire Insurance Company, 186 A.2d 232, 233 (D.C.Mun.App.1962);

Johnson v. Pacific Indemnity Company, 52 Cal.Rptr. 76, 79, 242 Cal.App.2d 878 (1966); Lichentag v. Millers Mutual Fire Insurance Company of Texas, 250 So.2d 105, 107 (C.A. La.1971); Klein & Brown, Inc. v. Fidelity & Deposit Company of Maryland, 59 Misc.2d 395, 299 N.Y.S.2d 298, 301–302 (1969); Offutt v. Liberty Mutual Insurance Company, 251 Md. 262, 247 A.2d 272 (1968); Hazuka v. Maryland Casualty Company, 183 Neb. 336, 160 N.W.2d 174, 177, 178 (1968).

For these several reasons—the principal one being that the findings of the trial court have substantial evidentiary support—I would affirm the judgment.

MOORE, C. J., and REES and UHLEN-HOPP, JJ., join this dissent.